**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ADRENA RODRIGUEZ and WILLIAM HODGE, individually and on behalf of a class of others similarly situated, | ) ) ) | Case No. 3:16-cv-02541-JGC |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PREMIER BANKCARD, LLC and FIRST PREMIER BANK, | ) ) | Hon. Judge James G. Carr |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.     BACKGROUND ................................................................................1

II.    LEGAL STANDARD...........................................................................7

III.   ARGUMENT .....................................................................................8

      A.    Legal Background. ....................................................................8

           1.    The Telephone Consumer Protection Act. ...................................8

           2.    The FCC's Rule on Revocation of Consent to Be Called...........9

           3.    The Decisions of the Third, Ninth, and Eleventh Circuits.........11

           4.    The Second Circuit's *Reyes* Decision. ......................................13

      B.    Overwhelming Case Law Supports Consumers' Ability to Revoke Consent to Be Called by Any Reasonable Means. ........................................14

      C.    *Reyes* Is Distinctly at Odds with Binding FCC Precedent Confirming Consumers' Statutory Right to Revoke Consent.........................................19

      D.    The Instant Contract Contains No Contractual Restriction On Revocation. .........23

      E.    Defendants' Consent Language Is Unconscionable. ...........................................25

      F.    Defendants Position that They Can Continue Calling Non-Customer Rodriguez After Being Told to Stop Is Wrong....................................................28

IV.   CONCLUSION.................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahlers v. Schebil*,
  188 F.3d 365 (6th Cir. 1999) ..................................................... 8

*Am. Express v. Italian Colors Restaurant*,
  133 S. Ct. 2304 (2013)..................................................... 18, 19

*Baisden v. Credit Adjustments, Inc.*,
  813 F.3d 338 (6th Cir. 2016) ..................................................... 10

*Berg v. Verizon Wireless*,
  No. 13-1, 2013 WL 8446598 (W.D. Wis. June 21, 2013) ..................................................... 20

*Brooklyn Savings Bank v. O'Neil*,
  324 U.S. 697 (1945)..................................................... 18

*Bush v. Dickerson*,
  No. 16-6140, 2017 WL 3122012 (6th Cir. May 3, 2017)..................................................... 8

*Cartrette v. Time Warner Cable, Inc.*,
  157 F. Supp. 3d 448 (E.D.N.C. 2016)..................................................... 19, 20

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)..................................................... 14

*DeVito v. Autos Direct Online, Inc.*,
  37 N.E.3d 194 (Ohio Ct. App. 2015)..................................................... 28

*Gager v. Dell Financial Services, LLC*,
  727 F.3d 265 (3d Cir. 2013)..................................................... passim

*Galbreath v. Time Warner Cable, Inc.*,
  No. 14-61, 2015 WL 9450593 (E.D.N.C. Dec. 22, 2015) ..................................................... 20

*Leyse v. Clear Channel Broad., Inc.*,
  545 F. App'x 444 (6th Cir. 2013) ..................................................... 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..................................................... 8

*McBride v. Ally Fin., Inc.*,
  No. 15-867, 2017 WL 3873615 (W.D. Pa. Sept. 5, 2017)..................................................... 18

*Mey v. Venture Data, LLC*,
   245 F. Supp. 3d 771 (N.D.W. Va. 2017) ............................................................... 23

*Mims v. Arrow Fin. Servs., L.L.C.*,
   565 U.S. 368 (2012) .................................................................................................. 9

*Nygaard v. Sioux Valley Hosps. & Health Sys.*,
   731 N.W.2d 184 (S.D. 2007) ................................................................................. 28

*O'Donoghue v. Smythe, Cramer Co.*,
   No. 80453, 2002 WL 1454074 (Ohio Ct. App. 2002) ........................................... 28

*ODW Logistics, Inc. v. Karmaloop, Inc.*,
   No. 12-996, 2014 WL 293816 (S.D. Ohio Jan. 27, 2014) ..................................... 30

*Osorio v. State Farm Bank, F.S.B.*,
   746 F.3d 1242 (11th Cir. 2014) ............................................................... 14, 21, 26

*Reyes v. Lincoln Auto. Fin. Servs.*,
   861 F. 3d 51 (2d Cir. 2017) ........................................................... 15, 16, 24, 25

*Schweitzer v. Comenity Bank*,
   866 F.3d 1273 (11th Cir. 2017) ............................................................... 14, 21, 23

*Scibana v. Aspen Woodside Vill., LLC*,
   No. 07-2443, 2007 WL 4510261 (N.D. Ohio Dec. 18, 2007) ............................... 27

*Skinner v. Bluestem Brands, Inc.*,
   No. 14-256, 2015 WL 4135269 (S.D. Miss. July 8, 2015) ........................ 19, 20, 30

*Target Nat'l Bank v. Welch*,
   No. 10-20178, 2016 WL 1157043 (M.D. Fla. Mar. 24, 2016) .................... 14, 27, 32

*Taylor Bldg. Corp. of Am. v. Benfield*,
   860 N.E.2d 1058 (Ohio Ct. App. 2006) ................................................................. 28

*Van Patten v. Vertical Fitness Grp., LLC*,
   847 F.3d 1037 (9th Cir. 2017) ................................................................... 9, 14, 21

*Wascovich v. Personacare of Ohio*,
   943 N.E.2d 1030 (Ohio Ct. App. 2010) ................................................................. 28

*Wright v. Target Corp.*,
   No. 14-3031, 2015 WL 8751582 (D. Minn. Dec. 14, 2015) .................................. 20

**Statutes**

47 U.S.C. § 227(b)(1)(A)(iii) ....................................................................................... 2, 8

47 U.S.C. § 227(b)(2) ......................................................................................... 9

Pub. L. No. 102-243 (1991) ............................................................................... 8

**Other Authorities**

Black's Law Dictionary(8th Ed. 2004) ............................................................. 28

Dobbs, The Law of Torts § 105 (2d ed. 2011) ................................................. 23

*In re Rules & Regs. Implementing the TCPA,*
    23 FCC Rcd. 559 (2008) ...................................................................... 10, 22

*In re Rules & Regs. Implementing the TCPA,*
    27 FCC Rcd. 15391 (2012) ............................................................ 10, 17, 22

*In re Rules & Regs. Implementing the TCPA,*
    29 FCC Rcd 3442 (2014) ...................................................................... 11, 22

*In re Rules & Regs. Implementing the TCPA,*
    30 FCC Rcd. 7961 (2015) ................................................................... passim

*In re Rules & Regs. Implementing the TCPA,*
    31 FCC Rcd. 9074 (2016) ...................................................................... 13, 22

*In re Rules & Regs. Implementing the TCPA,*
    7 FCC Rcd. 8752 (1992) ...................................................................... 10, 22

Rest. (2d) of Contracts .................................................................................. 16, 23

Restatement (Second) of Torts....................................................................... 17, 30

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................... 7

iv

The Telephone Consumer Protection Act ("TCPA") is intended to curb the staggering numbers of unwanted robocalls Americans receive by prohibiting autodialed or prerecorded-voice calls to consumers' cell phones unless the consumer has given his or her "prior express consent." Three federal courts of appeals—every court of appeals to have considered the question save one—and the Federal Communications Commission ("FCC") have concluded that, inherent in the concept of TCPA consumer consent is the ability to *revoke* that consent.

The right to revoke consent is grounded in both the text and purpose of the TCPA and the common-law definition of consent. The FCC in particular has stressed that the very notion of consumer consent under the TCPA is at risk if that consent is irrevocable. *See In re Rules & Regs. Implementing the TCPA*, 30 FCC Rcd. 7961, ¶ 63 (2015) (holding, in declaratory ruling binding under the Hobbs Act, that "[c]onsumers may revoke consent [to be called] in any manner that clearly expresses a desire not to receive further messages, and … callers may not infringe on that ability by designating an exclusive means to revoke") ("*2015 FCC Ruling*").

Using boilerplate in the fine-print of their unsigned form contract, Defendants Premier Bankcard, LLC and First Premier Bank ask this Court to allow them to make calls prohibited by federal law to customers (and even non-customers), in perpetuity, without any way for the recipient to ever get calls to stop. Such contract language conflicts with binding FCC precedent, longstanding case law, and the remedial purpose of the Telephone Consumer Protection Act. Defendants' motion for summary judgment should be denied.

I.    **BACKGROUND**

Plaintiffs William Hodge ("Hodge") and Adrena Rodriguez ("Rodriguez") bring this class action against Defendants Premier Bankcard, LLC and First Premier Bank (collectively, "Premier"), based on calls Defendants made to the cell phone numbers of Plaintiffs and others

using an automatic telephone dialing system ("autodialer" or "ATDS") or an artificial or prerecorded voice without prior express consent, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A)(iii).

Plaintiffs are a married couple who live together in Toledo, Ohio. *See* Plaintiffs' Resp. to Defs.' Statement of Undisputed Material Fact ("Pls.' SMUF") ¶ 1. At all relevant times, Plaintiff Hodge has been the sole, primary user of a cellular telephone number ending in 5597 ("5597 Number"), and Rodriguez has been the sole, primary user of a cellular telephone number ending in 7770 ("7770 Number"). Pls.' SMUF ¶ 4. Although Rodriguez has had her 7770 Number for longer (the number was ported from her prior service), Plaintiffs' cell service is provided through Page Plus, via a joint account Plaintiffs obtained in 2015. Pls.' SMUF ¶ 2. Although Hodge handles payment for the couple's cell service on a monthly basis for each line, Plaintiff Rodriguez can access the account if she desires or needs to, and the lines are delineated as "hubby" or "wife" with their provider. *Id.*

Plaintiff Rodriguez keeps her cell phone with her; Hodge has never borrowed Rodriguez' cell phone, let alone answered it without her expressly telling him to do so. Pls.' SMUF ¶ 4. Plaintiffs do have an understanding that they may each provide the other's phone number as a secondary contact number when it's important that two numbers be provided—for example, when two telephone numbers are required in order to complete an application, or to a doctor's office or public utility. Pls.' SMUF ¶ 30. However, Plaintiff Rodriguez did not give Hodge express permission to provide her cell phone number to Defendants. Pls.' SMUF ¶ 19.

Premier Bankcard, LLC is the servicing entity for the credit card that is issued by First Premier Bank. Emme Dep. at 4. In July 2014, Plaintiff Hodge opened a credit card account with Premier in his name, only ("2014 Account"), applying online after receiving a letter in the mail

2

from Premier telling him he was preapproved. Pls.' SMUF ¶¶ 8, 9. In completing his online application applicable to the 2014 Account, Hodge did not provide either the 5597 Number or 7770 Number to which the calls at issue in this case were made; rather, he provided his *prior* cell phone number in the "Home" number field of the application. Pls.' SMUF ¶ 33.

Hodge provided his 5597 Number to Defendants as a contact number when disputing fraudulent charges via a fax he sent to Premier on March 9, 2015, *see* Dkt. No. 30-9, Emme Decl. at Ex. C.[1] Pursuant to its normal business practices, Defendants took the 7770 Number it obtained from a credit bureau when Hodge submitted a consumer dispute with the bureau as to his 2014 Account, and associated it as a phone number at which Hodge could be contacted *generally* as to all accounts. Emme Dep. at 47-48, 51-52 (admitting that "[no] information [was] directly transmitted from Mr. Hodge to Premier Bankcard having to do with this dispute"), 109. Following this, when Hodge called Premier to report his lost credit card on February 5, 2016, Premier's representative asked Hodge to confirm that he was the customary user of Rodriguez' 7770 Number it had for him in its system and that it was a "good number to call and leave messages" in relation to the 2014 Account. Pls.' SMUF ¶¶ 24-25; Romanelli Decl. at Ex. A. Hodge confirmed that he could be reached at the Number, but informed Premier that it was, in fact, his *wife's* telephone number. *Id.* (also verifying his own 5597 Number, as well).

In March 2016, Plaintiff Hodge opened a second credit card account with Premier in his name, only ("2016 Account"), again applying online after receiving a letter in the mail from

---

[1]     Plaintiffs dispute Defendants' assertion that "[o]n October 2, 2014, Hodge submitted new information relating to the July 2014 Account through Premier's website; specifically, he listed a cellular telephone number ending in 7770 … as a contact number for him[,]" and that "[a]fter submission, Premier's website updated the July 2014 Account with the 7770 Number." Dkt. No. 30-9, Emme Decl. ¶¶ 14-15. This conflicts with Defendants' Rule 30(b)(6) deposition testimony, which does not identify such incident as a means in which Premier purportedly obtained the 7770 Number. *See* Pls.' SMUF ¶ 17; Emme Dep. at 66-68.

3

Premier telling him he was preapproved. Pls.' SMUF ¶ 9. Premier's records reflect that the information it associated with Hodge as to the 2016 Account included Hodge's 5597 Number as his "Cell" phone number and Rodriguez' 7770 Number as his "Home" phone number. Pls.' SMUF ¶ 26. Hodge did not intentionally provide this information in his application for the second account; if anything, it was prepopulated. *Id.*

Soon after opening one of his accounts, Hodge received a packet of materials in the mail from Premier, which included a white, multi-folded sheet of paper containing fine print, titled, "First Premier Bank Credit Card Contract and Account Opening Disclosures" ("CCA"). *See* HODGE-RODRIGUEZ000008; Pls.' SMUF ¶ 12. This CCA matches the agreement Premier says it sent to Plaintiff in relation to his 2014 Account. *Id.* Hodge did not read the fine print in the CCA, which is unsigned and was never negotiated between the parties. Pls.' SMUF ¶ 12. However, Plaintiffs acknowledge that the fine print in the multi-folded CCA contains the following language in the middle of one of the folded pages:

> **Where We Send Statements:** … If you elect to receive Statements and other communications electronically, **we may send those Statements and communications *as directed by you*** ….

> **Consent to calls and messages using autodialer, prerecorded message and artificial voice:** You agree and expressly consent that we and our agents, affiliates, contractors, subcontractors, and assignees may call or contact you at any cellular, mobile, home, work, or other telephone number, electronic mail address, or other digital or electronic communication terminal, link, point or address of any kind whatsoever that (a) you provide or use to contact us, (b) we obtain from a third party such as an employer, friend, family member, another creditor, or person with whom you have done business, or (c) we obtain through any legal means, including without limitation, a caller identification system that captures your number. You expressly consent to receiving calls, text messages and other communications from us, our agents, affiliates, contractors, subcontractors, and assignees on any number that is assigned to a cellular telephone service, wired telephone service, paging service, facsimile machine, specialized mobile radio service, radio common carrier service, internet protocol service, or other electronic, digital or analog service that is placed through or utilizes an automatic telephone dialing system, artificial voice or pre-recorded

4

message, or any other technology, even if you incur a cost when we contact you. You accept responsibility for all costs you incur when contacted through any of these means.

Pls.' SMUF ¶¶ 14-15; HODGE-RODRIGUEZ000008 (emphasis added). Hodge had difficulty even reading the CCA presented by Defendants at his deposition. Pls.' SMUF ¶ 12.

In 2016, Plaintiffs began to struggle financially, causing Hodge to fall behind on his Premier accounts. Pls.' SMUF ¶ 35. When Hodge fell behind, Premier was the first of Plaintiff's creditors to start contacting him for payment; while others used e-mail or would limit calling to once a week, Defendants proceeded to aggressively call both Plaintiffs in relation to Hodge's account, at times multiple times a day. Pls.' SMUF ¶ 36.

Premier knew that the 7770 Number was Hodge's wife's phone number, not his; Hodge directly told Premier that the 7770 Number was his wife's when asked to confirm that he was its customary user during a call on February 5, 2016. Hodge Dep. at 68; Rodriguez Dep. at 40-44. Romanelli Decl. at Ex. A. Premier also spoke with Rodriguez when it called her 7770 Number trying to reach Hodge, e.g., Romanelli Decl. at Ex. B. Rodriguez told Defendants to stop calling her 7770 Number at least three times, including when she first started receiving their calls and during a telephone call on July 7, 2016. Pls.' SMUF ¶ 47.

Prior to July 2016, Rodriguez also informed Hodge that the calls she was receiving in relation to his Premier accounts were a nuisance and that she did not want to receive them, and she instructed Hodge to tell Premier to stop calling. Pls.' SMUF ¶ 40. For example, after a call Rodriguez received on her 7770 Number from Defendants for Hodge on May 19, 2016, Rodriguez told Hodge to have Defendants call *his* phone. *Id.* In response to Rodriguez telling him she did not want to be called, Hodge called Premier and asked it to stop calling, including on July 12, 2016, and at least one additional time prior. *Id.* Specifically, on July 12, 2016, Hodge

5

called Premier and (1) expressed displeasure with Premier's relentless calling during a time he

was at the hospital dealing with his daughter; (2) requested that Premier cease all calling, and (3)

indicated that any future communications should be done by mail. Romanelli Decl. at Ex. C;

Pls.' SMUF ¶ 47. In response to Plaintiff Hodge's request, Premier's representative indicated

that he would "make that happen." *Id.* Nonetheless, Defendants continued to call Plaintiffs,

forcing Hodge to again inform Defendants, during a call from Premier on August 17, 2016, that

he had previously asked it to stop and that the calling was inconvenient. Romanelli Decl. at Ex.

D (Defendants' representative indicting that he would "get that noted"); *Id.*

Despite the above requests to stop calling on July 7, 2016, July 12, 2016 and August 17,

2016, Defendants continued calling Plaintiffs' cell phones. Hodge Dep. at 31-33, Rodriguez Dep.

at 47-57. Specifically, Premier used its Noble dialer to call Rodriguez' 7770 Number on at least

the following dates: May 13, 2016, May 14, 2016 (2 calls), May 16, 2016 (2 calls), May 17,

2016 (2 calls), May 18, 2016 (2 calls), May 19, 2016, July 7, 2016, July 8, 2016, July 25, 2016,

July 27, 2016 (3 calls), July 28, 2016 (3 calls), July 29, 2016 (3 calls), July 30, 2016 (2 calls),

July 31, 2016 (2 calls), August 1, 2016, August 2, 2016 (2 calls), August 11, 2016 (2 calls),

August 12, 2016 (2 calls), August 13, 2016, August 15, 2016, August 16, 2016 (2 calls), August

17, 2016 (3 calls). Pls.' SMUF ¶ 37. Premier also called Rodriguez' 7770 Number on May 13,

2016, May 14, 2016 (2 calls), May 16, 2016 (2 calls), May 17, 2016 (2 calls), May 18, 2016 (2

calls), May 19, 2016, and July 28, 2016. *Id.* Likewise, Premier used its Noble dialer to call

Hodge's 5597 Number on at least the following dates: May 13, 2016, May 14, 2016 (2 calls),

May 16, 2016 (3 calls), May 17, 2016 (2 calls), May 18, 2016 (2 calls), May 19, 2016, July 7,

2016, July 8, 2016, July 25, 2016, July 27, 2016, July 28, 2016 (2 calls), July 29, 2016 (2 calls),

July 30, 2016, August 1, 2016, August 2, 2016 (2 calls), August 11, 2016 (2 calls), August 12,

2016 (2 calls), August 13, 3016, August 15, 2016, August 16, 2016 (2 calls), and August 17, 2016 (4 calls). *Id.* Premier also called Hodge's 5597 Number on May 13, 2016, May 14, 2016 (2 calls), May 16, 2016 (3 calls), May 17, 2016 (2 calls), May 18, 2016 (2 calls), May 19, 2016, and August 12, 2016. *Id.*

Plaintiffs were upset by the repeated calls from Premier, some of which occurred while Plaintiffs were attending to the recent birth of their child. Pls.' SMUF ¶ 40. Rodriguez has no relation to Hodge's accounts with Premier; she has never even used his Premier credit cards. Pls.' SMUF ¶ 8.  In fact, Rodriguez only became aware that Hodge had opened accounts with Premier after he had done so; she did not know he had provided her phone number to Defendants until after she started receiving their calls. Pls.' SMUF ¶ 11. Both Plaintiffs were upset that the calls continued after they asked Defendants to stop. Pls.' SMUF ¶ 40.

## II.  <u>LEGAL STANDARD</u>

Summary judgment should be granted only where the movant meets its burden of showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Credibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment[.]" *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999). Rather, "[i]n applying the summary-judgment standard, the court must review all materials supplied, including all pleadings, in the light most favorable to the nonmoving party." *Bush v. Dickerson*, No. 16-6140, 2017 WL 3122012, at *2 (6th Cir. May 3, 2017) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

7

## III.    ARGUMENT

### A.    Legal Background.

#### 1.    *The Telephone Consumer Protection Act.*

The TCPA is a remedial consumer protection statute designed to protect Americans from "the scourge of modern civilization": automated junk calls. 137 Cong. Reg. 30,821 (1991); *see* Pub. L. No. 102-243, 105 Stat. 2394, § 2(10) (consumers "consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy"). Recognizing that most consumers have no practical way to avoid these unwanted autodialed calls, which can be made *en masse* with little marginal expense to the caller, Congress saw banning computerized calls as the only effective way to solve the problem. *Id*. § 2(12). Because unwanted robocalls to cell phones are especially problematic—cell phones are with us all the time and in all situations, and consumers may be charged for each call or text—the restrictions on calls to cell phones are greater than they are to residential landlines.

Specifically, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). Pursuant to a narrow exception, callers that have the recipient's "prior express consent" may use automated equipment to call cell phones. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017) (consent under the TCPA is an affirmative defense). Despite the longstanding prohibitions of the TCPA, unwanted robocalls "[m]onth after month . . . top the list of the consumer complaints received by the [FCC]." *2015 FCC Ruling*, 30 FCC Rcd. at 7964. Another

8

agency, the Federal Trade Commission, receives literally hundreds of thousands of robocall complaints every month. *Id.* at 7969.

It's no wonder the complaints continue. Five years ago, "bad actors [could] blast literally tens of millions of illegal robocalls over the course of a single day at less than 1 cent per minute." *Mims v. Arrow Fin. Servs., L.L.C.*, 565 U.S. 368, 370 (2012). Today, advances in technology and the ubiquity of cell phones and smartphones mean that sending unwanted calls and texts *en masse* "has never been easier or less expensive," *2015 FCC Ruling*, 30 FCC Rcd. at 7970, making the TCPA's prohibition on unwanted calls ever more important.

> 2. *The FCC's Rule on Revocation of Consent to Be Called.*

Congress gave the FCC authority to implement and enforce the TCPA. 47 U.S.C. § 227(b)(2). Pursuant to that authority, the FCC has ruled that "prior express consent" in the TCPA means that, not only must consumers give prior express consent to be robocalled on their cell phones, but consumers have an unqualified right to revoke their prior consent to be autodialed on their cell phones through any reasonable means. *2015 FCC Ruling*, 30 FCC Rcd. at 7993. FCC orders, rules and regulations are the Law of the Land, and are unreviewable other than through "direct appeal from the FCC." *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 342 (6th Cir. 2016).

In the decades since the TCPA was enacted, the FCC has interpreted the "prior express consent" exception to the ban on autodialing cell phones several times. In its <u>1992</u> TCPA order, for instance, the FCC found that, regardless of whether the called party has provided prior express invitation or permission to be called, "subscribers may ... revoke consent to any future solicitations, by requesting that they not receive further calls from a telemarketer[.]" *In re Rules & Regs. Implementing the TCPA*, 7 FCC Rcd. 8752, ¶ 24, n. 47 (1992).

9

In 2008 the FCC considered "prior express consent" in the context of debt collection, pursuant to a request for clarification of the rules by creditors' rights organization ACA International. *In re Rules & Regs. Implementing the TCPA*, 23 FCC Rcd. 559, at ¶ 9 (2008). The FCC found that providing one's cell phone number to a creditor constituted consent to receive debt collection calls as to the particular account at issue, but noted an exception if the consumer provides "instructions to the contrary." *Id*.

In 2012, the FCC again confirmed that a consumer could revoke consent for automated calling under 47 U.S.C. § 227(b)(1)(A)(iii), when it unequivocally noted that consumers may verbally request that telemarketing calls stop. *In re Rules & Regs. Implementing the TCPA*, 27 FCC Rcd. 15391, 15398 at ¶13 (2012). ("*SoundBite*"). The FCC suggested that the date of an "opt-out" text can help establish the point at which TCPA violations begin. *Id*. at ¶10, n. 46.

In 2014, the FCC again confirmed that, a consumer could consent to being called through an intermediary, but made sure to emphasize that consent is contingent on there being no "instructions to the contrary." *In re Rules & Regs. Implementing the TCPA*, 29 FCC Rcd 3442, at ¶¶ 10-11 (2014).

In 2015, the FCC squarely addressed the statutory right to revoke consent, in response to a petition filed by consumer credit-issuer Santander International's request to the FCC to "clarify and confirm that 'prior express consent' to receive non-telemarketing [voice] calls and text messages to cellular telephones sent using an [autodialer] and/or an artificial or prerecorded voice message cannot be revoked," or alternatively, that a creditor may "designate the exclusive method" for revocation. *2015 FCC Ruling*, 30 FCC Rcd. at 7993 ¶ 55.

The 2015 FCC Ruling cleanly rejected the notion that consent could not be revoked, and eschewed the argument that a creditor could dictate the means by which such consent could be

revoked, clarifying that "consumers may revoke consent through any reasonable means" and finding that by "contrast, an interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA and to common-law notions of consent." *Id*. at 7994,¶¶ 55, 56.

Also in its 2015 order, the FCC expressly rejected the argument that a caller could designate the means of revocation through any means, including through contract, stating flatly that "callers may not control consumers' ability to revoke consent." *Id*. at 7996. In short, the FCC made clear that consumers' right to revoke consent by any reasonable means was a non-negotiable statutory guarantee.

The FCC again emphasized the importance of consent revocation again in 2016 in the context of collection calls on US-backed debts in *In re Rules & Regs. Implementing the TCPA*, 31 FCC Rcd. 9074, 9090 (2016), where it stated that the "ability to stop unwanted calls is critical to the TCPA's goal of consumer protection."

### 3. *The Decisions of the Third, Ninth, and Eleventh Circuits.*

Three of four circuit courts of appeal to have considered the question have confirmed that the TCPA gives consumers an unqualified right to revoke consent to be robocalled on their cell phones.

*Gager v. Dell Financial Services, LLC*, 727 F.3d 265 (3d Cir. 2013), involved prior express consent given as part of an application for open-ended credit. In holding that the consumer could revoke her consent to be called, *Gager* relied, in part, on the FCC's *SoundBite* order's conclusion that consumers have a right to revoke consent to be robocalled. *Id*. at 269, 271-72. Further, the Third Circuit expressly rejected Dell's argument that Gager could not revoke her consent as a matter of contract law because the consent to be called was part of the

11

consideration for granting Gager's credit application—the only credit-related document Gager signed. *Id.* at 273-74. The court explained that the contractual relationship between the parties did not waive Gager's rights under the TCPA. *Id.* at 274. In its 2015 order, the FCC expressly agreed with *Gager. 2015 FCC Ruling*, 30 FCC Rcd. at 7993.

The Eleventh Circuit, in *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014), which also involved consent given in the context of an open-ended credit application, followed *Gager* as to whether consent could be revoked, and the only real question was whether oral revocation was valid. *Id.* at 1252 (following *Gager*), 1255 (discussing oral revocation). In discussing the method of revocation, the Eleventh Circuit hinted that perhaps the parties' contract could designate the method of revocation—a possibility that has since been foreclosed by the *2015 FCC Ruling*—but made no indication that the parties' open-ended credit arrangement could foreclose revocation altogether. *Id.* at 1255; *see Target Nat'l Bank v. Welch*, No. 10-20178, 2016 WL 1157043, at *5 (M.D. Fla. Mar. 24, 2016) (following *Osorio* in finding consumer could revoke contractual consent).

The Ninth Circuit addressed revocation of consent with the benefit of the FCC's 2015 order in *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017), and found the FCC's conclusion reasonable under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984). There, the consumer gave his cell phone number to a gym as part of the gym-joining process, and his cell phone number was included as part of his gym membership agreement. *Van Patten*, 847 F.3d at 1040. A substantial question in the case was whether the cancelation of Van Patten's gym membership constituted a revocation of his consent (it didn't). *Id.* at 1047.

12

Most recently, the Eleventh Circuit ratified *Osorio* and clarified in *Schweitzer v. Comenity Bank*, 866 F.3d 1273 (11th Cir. 2017), that consumers have a right to revoke consent. *Schweitzer* went even further, finding that consumers may "partially" revoke consent by telling a creditor that it may call, for example, at night but not during work hours. *Schweitzer* held:

> We therefore conclude that the TCPA allows a consumer to provide limited, i.e., restricted, consent for the receipt of automated calls. It follows that unlimited consent, once given, can also be partially revoked as to future automated calls under the TCPA. "The consent principle ... makes [a person's] right of self-determination or autonomy the centerpiece of the law on intentional torts." Dobbs, The Law of Torts § 105, at 319.

*Id.* at 1277.

### 4. The Second Circuit's Reyes Decision.

*Reyes v. Lincoln Auto. Fin. Servs.*, 861 F. 3d 51 (2d Cir. 2017), involved a consumer, Reyes, who received nearly 400 prerecorded collection calls from the defendant after allegedly failing to make required payments under a car lease. *Id.* at 54. Reyes claimed that he had sent the defendant a letter requesting that the calling cease, which the defendant argued was neither received nor effective under the lease agreement through which it obtained his number, due to a provision expressly permitting it to contact him by phone. *Id.* at 53–54. The Second Circuit affirmed the district court's order granting summary judgment for the defendant, finding that Reyes had failed to present sufficient evidence showing that he had revoked consent to be called and that, regardless, "the TCPA does not permit a consumer to revoke its consent to be called when that consent forms part of a bargained-for exchange." *Id.* at 53.

In contrast to *Gager*, *Osorio*, *Schwietzer*, binding FCC precedent and the TCPA's remedial consumer protection purpose, the Second Circuit interpreted the lack of an express provision in the TCPA permitting revocation to mean that consumers are prohibited from doing so if the "consent [wa]s given, not gratuitously, but as bargained-for consideration in a bilateral

contract." *Id.* at 56-58. The court distinguished between "consent" under tort and contract law, viewing one's "voluntary consent" to have his or her privacy invaded in violation of the TCPA as being revocable under tort law, but unilaterally irrevocable once set forth in a legally binding agreement. *Id.* at 57-58.[2] Unlike other courts, the Second Circuit also refused to deem the consent-to-call provision ambiguous or a non-essential term of the contract, though it should be noted that the provision itself didn't specifically *prohibit* revocation.[3] Ultimately, the Second Circuit expressed sensitivity to what it viewed as a "hypothetical concern" that its opinion would lead to rampant telecommunications abuses undermining the TCPA—in a case in which the consumer had already been allegedly robocalled nearly 400 times by the same defendant despite telling it to stop—and suggested that Congress could address such concerns through further legislation. *Reyes*, 861 F.3d at 59.

### B.   Overwhelming Case Law Supports Consumers' Ability to Revoke Consent to Be Called by Any Reasonable Means.

*Gager v. Dell Fin. Servs., LLC*, 727 F. 3d 265, 270 (3d Cir. 2013) is the seminal case on revocation of consent, and Defendants do not even mention it. *Gager* predates *Reyes* and reached the opposite conclusion as to contractual implications on revocation of consent. As noted above, in *Gager*, the Third Circuit considered whether a consumer who submitted her phone number as required on a written credit application could properly revoke prior express consent under the TCPA for the defendant's subsequent autodialed collection calls. 727 F.3d at 267. In finding consent revocable under the TCPA, the court recognized that this was consistent with the basic common law principle that consent is revocable. *Id.* at 271 ("[A]t common law, consent may be

---

[2]    *But see* Rest. (2d) of Contracts ¶ 195 ("A term exempting a party from tort liability for harm caused intentionally … is unenforceable on grounds of public policy.").

[3]    *See Gager*, 727 F.3d at 274 ("[T]he ability to use an autodialing system to contact a debtor is *plainly not an essential term to a credit agreement*.") (emphasis added).

withdrawn.")[4] Likewise, "[b]ecause the TCPA is a remedial statute, it should be construed to benefit consumer[,]" and the court thus interpreted the absence of any provision directly prohibiting revocation in the TCPA to mean that revocation is permitted. *Id.* at 271-72. Moreover, the court found that the FCC had already conclusively ruled that prior express consent is revocable under the TCPA. *Id.* at 271-72 (citing *Soundbite*, 27 FCC Rcd. 15391 (2012)).

Although *Reyes* suggests that the facts in *Gager* involved what it called "voluntary consent" as opposed to a contracted term permitting calling, *Gager* in fact explicitly rejected such reasoning:

> Dell asserts that basic principles of contract law should preclude Gager from revoking her prior express consent. In short, Dell posits that a creditor will want to know in advance whether a credit applicant will consent to automated phone calls and that this knowledge is part of the "consideration" that the applicant offers in support of her application.
>
> Although Dell is correct that the level of contact that a debtor will consent to may be relevant to the negotiation of a line of credit, the ability to use an autodialing system to contact a debtor is plainly not an essential term to a credit agreement.
>
> More importantly, Dell's argument that its contractual relationship with Gager somehow waives her rights under the TCPA is incorrect.
>
> The fact that Gager entered into a contractual relationship with Dell did not exempt Dell from the TCPA's requirements. As discussed above, she retained the right to revoke her prior express consent.

*Gager*, 727 F.3d at 273-274 (spacing supplied). Notably, in spite of the newness of *Reyes*, there is already at least one opinion criticizing the untenable implication contained within *Reyes* that it

---

[4]       *See, e.g.,* Restatement (Second) of Torts § 892A, cmt. i (1979) ("[C]onsent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct.").

15

is not in conflict with *Gager*.[5] *See McBride v. Ally Fin., Inc.*, No. 15-867, 2017 WL 3873615, at *2 (W.D. Pa. Sept. 5, 2017) (noting that "the Court is not entirely persuaded by Respondent's (and the *Reyes*'s Court's) efforts to distinguish [*Gager*]," and that "*Gager* is one of the strongest statements, in terms of interpreting revocation-of-consent consistently with the remedial purposes of the TCPA; and the Court cannot lightly cast-aside language in *Gager* supporting a contrary conclusion").

Indeed, *Reyes* contradicts longstanding precedent prohibiting the prospective waiver of statutory rights on public interest grounds. "[A] statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy…. Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate." *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 704 (1945); *see also Am. Express v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2313-14 (2013) (J. Kagan, dissent) (It is "uncontroversial" that "courts will not enforce a prospective waiver of the right to gain redress for an antitrust injury…. The same rule applies to other important federal statutory rights.").[6] The implications of Defendants' motion—that businesses and, indeed, entire industries can forever lock consumers into unbridled, automated calling by simply including broad consent language in the

---

[5]    Notably, the *Reyes* opinion effectively dismissed the holding of *Gager* (without acknowledging conflict) by expressing a difference of opinion concerning the significance of whether consent was an "essential term" to the agreement at issue.  It did not address, however, the Third Circuit's additional ruling that entering into a contractual relationship cannot serve as a waiver of statutory rights under the TCPA.

[6]    **Error! Main Document Only.**The majority in *American Express* held that an arbitration agreement was enforceable because it merely provided a forum for resolving the claim.  In doing so, it held that its precedents against prospective waivers of statutory rights "would certainly cover a provision in [a contract] forbidding the assertion of certain statutory rights." *Am. Express*, 133 S. Ct. at 2310.

16

boilerplate of their form adhesion contracts—necessarily undermines the consumer privacy protections Congress intended in enacting the TCPA, and cannot be permitted. *See Skinner v. Bluestem Brands, Inc.*, No. 14-256, 2015 WL 4135269, at *3-4 (S.D. Miss. July 8, 2015) ("[Defendant] has not pointed to any legal authority giving parties permission to contract around the TCPA. If they could, one imagines that every company in the nation—from Dell Financial and State Farm Bank, to every student loan provider, to every catalog sales company—would amend their contracts to require customers to waive every right their customers currently have.").

The overwhelming breadth of case law agrees with *Gager* that businesses cannot irrevocably contract consumers out of their TCPA rights. In *Cartrette v. Time Warner Cable, Inc.*, for example, the defendant moved for summary judgment, arguing—like Defendants here—that the consumer plaintiff's consent was irrevocable based on its nonnegotiable form agreement containing a term permitting automated calling. 157 F. Supp. 3d 448, 450 (E.D.N.C. 2016). Relying on *Gager* and *Osorio*, the court denied summary judgment, recognizing that "a consumer complaining about unwanted telephone calls often has a contractual relationship with the company placing those calls … [that] may require that the consumer provide her telephone number and consent to receiving automated or prerecorded calls[,] … [but] such a contract does not prevent a consumer from revoking her prior express consent pursuant to the TCPA." *Id.* at 453. Not only is "use of an ATDS … not an essential term of an agreement," but "parties lack legal authority to contract around rights provided by the TCPA." *Id.*

Courts almost uniformly agree that prohibiting consumers from revoking consent runs counter to the TCPA's remedial purpose and will result in companies (like Defendants here) including nonnegotiable consent provisions in their boilerplate that effectively eviscerates the TCPA's protections. *See, e.g., Wright v. Target Corp.*, No. 14-3031, 2015 WL 8751582, *7 (D.

17

Minn. Dec. 14, 2015) (rejecting contractual argument later endorsed in *Reyes*, citing *Gager*); *Skinner*, 2015 WL 4135269, at *3-4 (similarly rejecting contractual consent argument); *Berg v. Verizon Wireless*, No. 13-1, 2013 WL 8446598, at *1 (W.D. Wis. June 21, 2013) ("Nothing in this broad language [of the TCPA] suggests that consumers who consent initially in the context of a contractual relationship should be treated differently under the statute."); *Galbreath v. Time Warner Cable, Inc.*, No. 14-61, 2015 WL 9450593, at *4 (E.D.N.C. Dec. 22, 2015) (denying defense motion for summary judgment, noting that "[a]lthough companies … remain free to include express-consent provisions in contracts with customers, the FCC's 2015 Ruling requires companies to accept revocation of consent by "any reasonable method[,] including orally or in writing") (quoting *2015 FCC Ruling*, 30 FCC Rcd. at 7996).

And again, the Ninth and Eleventh Circuits employed similar reasoning and quoted *Gager* with robust approval in *Van Patten*, *Osorio*, and *Schweitzer*, which likewise confirmed consumers' right to revoke consent under the TCPA. *Van Patten*, 847 F.3d at 1048; *Osorio*, 746 F.3d at 1255-256; *Schweitzer*, 866 F.3d at 1277. *Schweitzer* is particularly relevant, since the defendant in that case had, like Premier, similarly argued that the plaintiff had contractually, irrevocably agreed to be called.[7] *Id.* at 1277 ("We think it logical that a consumer's power under the TCPA to completely withdraw consent and thereby stop all future automated calls … encompasses the power to partially withdraw consent and stop calls during certain times.").

Given these facts, it is not hard to guess why Defendants chose not to discuss the highly salient *Gager* opinion in their motion. Where the *Reyes* decision serving as the basis for

---

[7]     *See* <u>Exhibit 7</u>, Excerpt of *Schweitzer* Appellee's Appendix Volume I at p. 125*, Schweitzer v. Comenity Bank*, No. 15-80665 (S.D. Fla. Sept. 18, 2015) (Dkt. No. 24, Def.'s Mot. Summary Judgment ¶ 20) (arguing that "[o]ne of the rights that Comenity Bank obtained via the [Credit Card Agreement] was the right to communicate with Plaintiff 'through various means such as … any cell, landline, or text number that [Plaintiff] provide[d], … auto dialer systems, … [and] recorded messages'") (quoting agreement).

18

Defendants' motion is an outlier that runs counter to the TCPA's remedial purpose and longstanding case law, Defendants' motion should be denied.

### C. *Reyes* **Is Distinctly at Odds with Binding FCC Precedent Confirming Consumers' Statutory Right to Revoke Consent.**

In addition to being in conflict with the holdings of other courts, the *Reyes* opinion upon which Defendants base their motion also conflicts with more than two decades of FCC regulatory precedent supporting consumers' substantive right to revoke consent to be called:

- In a 1992 order, the FCC confirmed that "prior express consent" under the TCPA is contingent on the consumer's "knowing[] release" of his telephone number for anticipated normal business communications, but stressed that such invitation or permission to be called is subject to any "instructions to the contrary."[8] *In re Rules & Regs. Implementing the TCPA*, 7 FCC Rcd. 8752, at ¶ 31 (1992) ("*1992 FCC Order*").

- In 2008, the FCC reconfirmed this right to provide "instructions to the contrary" as to consent to receive debt collection calls. *In re Rules & Regs. Implementing the TCPA*, 23 FCC Rcd. 559, at ¶ 9 (2008).

- In 2012, the FCC again confirmed that a consumer could revoke consent for automated calling under 47 U.S.C. § 227(b)(1)(A)(iii), even suggesting that "opt-out" receipts sent via text message after a consumer asks not to receive further automated text message calls can be useful in establishing at what point the caller may have continued violating the statute. *Soundbite*, at ¶ 10 n. 46.

- In 2014, the FCC confirmed that, a consumer could consent to being called through an intermediary, and again made such consent contingent on there being no "instructions to the contrary." *In re Rules & Regs. Implementing the TCPA*, 29 FCC Rcd 3442, at ¶¶ 10-11 (2014).

- In 2015, the FCC unequivocally held that "**consumers may revoke consent through any reasonable means**," *2015 FCC Ruling*, at ¶ 55, adopting *Gager*'s reasoning and rejecting the petitioner's request to deem past consent irrevocable. Moreover, the FCC clarified that a business cannot even limit the *manner* in which consent can be revoked: "**[C]onsumers may revoke consent in any manner** that clearly expresses a desire not to receive further messages, and … **callers may not infringe on that ability** by designating

---

[8] The *1992 FCC Order* similarly confirmed, in relation to telephone solicitations to parties with whom the caller has received the called party's prior express invitation or permission, that "subscribers may sever any business relationship, i.e., revoke consent to any future solicitations, by requesting that they not receive further calls from a telemarketer[.]" *Id.* at ¶ 24 n. 47.

an exclusive means to revoke…. Consumers have a right to revoke consent, using any reasonable method including orally or in writing." *Id.* at ¶¶ 63-64.[9]

- In 2016, the FCC stated that "an ability to stop unwanted calls is critical to the TCPA's goal of consumer protection." *In re Rules & Regs. Implementing the TCPA*, 31 FCC Rcd. 9074, 9090 (2016).

The *Reyes* opinion upon which Defendants rely frames itself entirely around the supposed common law limitations of revocation of contractually-given consent.[10]  However, while the seminal *2015 FCC Ruling* on the issue of revocation of consent (which, importantly, cites *Gager* extensively with approval) does mention that its conclusions find support in common law, it is also evident that that FCC used its express regulatory authority to explicitly provide for a broad, substantive federal **statutory** right of revocation under the TCPA. Specifically, the FCC stated in the *2015 FCC Ruling* that:

> We turn first to the threshold issue of whether a consumer has the right to revoke previously-given prior express consent. Because the TCPA does not speak directly to the issue of revocation, the Commission can provide a reasonable construction of its terms.

---

[9]     Indeed, the FCC reasoned that companies like Defendants cannot dictate the means by which consent can be revoked, as "allow[ing] callers to designate the exclusive means of revocation would, at least in some circumstances, materially impair that right." *Id.* at  66.

[10]     While *Reyes* interpreted revocation in relation to contract law, *Gager*, *Schweitzer*, and other opinions interpreted revocation in relation to the law of torts. Plaintiff submits that, where the TCPA is a privacy statute sounding in tort, a tort-based approach is more appropriate, and better serves the consumer privacy interests implicated under the TCPA. *See, e.g., Schweitzer*, 866 F.3d at 1277 ("The consent principle ... makes [a person's] right of self-determination or autonomy the centerpiece of the law on intentional torts.") (quoting Dobbs, The Law of Torts § 105, at 319 (2d ed. 2011)); *see also Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 779 (N.D.W. Va. 2017) ("[T]he harm caused by unwanted robocalls to cell phones has a close relationship to the harm recognized by this ancient common law tort—a tort that protects fundamental property rights. Indeed, the TCPA can be viewed as merely applying this common law tort to a 21st-century form of personal property and a 21st-century method of intrusion."). But *even under contract law,* a party cannot force another to submit to an intentional tort like invasion of privacy. Rest. (2d) of Contracts ¶ 195 ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.").

> We agree with the Third Circuit that, "in light of the TCPA's purpose, any silence in the statute as to the right of revocation should be construed in favor of consumers."

> We therefore find the most reasonable interpretation of consent is to allow consumers to revoke consent if they decide they no longer wish to receive voice calls or texts. This gives consent its most appropriate meaning within the consumer-protection goals of the TCPA.

> By contrast, an interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA and to common-law notions of consent.

*2015 FCC Ruling*, 30 FCC Rcd. at 7993-94 (spacing supplied). In addition, the FCC clarified that it was "not rely[ing] on common law to interpret the TCPA to include a right of revocation. We simply note our conclusion is consistent with the common law right of revocation and do not attempt to substitute common law for statutory law." *Id.* at 7995. To put this in other words, the FCC established a **<u>statutory</u>** right of revocation by virtue of its interpretive authority that **<u>does not</u>** depend upon common law.

The significance of this statutory right of revocation created by FCC regulation is twofold. First, to the extent the *Reyes* court might have been inclined to disagree with the FCC, it could only have done so pursuant to a direct appeal of the FCC's order to the court of appeals pursuant to the Hobbs Act. *Leyse v. Clear Channel Broad., Inc.*, 545 F. App'x 444, 459 (6th Cir. 2013) (Hobbs Act deprived district court and Sixth Circuit of jurisdiction over argument that FCC-created TCPA exemption was invalid or should be set aside). Because *Reyes* contradicts FCC final orders—including the *2015 FCC Ruling*'s holding that consumers have an unassailable right to revoke consent under the TCPA—the decision extends beyond the court's jurisdiction. This Court should not similarly overreach. Secondly, the bounds of the statutory right of revocation created by the FCC must be determined independently of any limitations imposed by common law, as the *Reyes* opinion correctly recognized that Congress (in this case

acting through the FCC) *does* have the authority to override written consent provided as part of a contract. *Reyes*, 861 F.3d at 57–58 (implicitly recognizing Congress's authority by stating "we cannot conclude that Congress intended to alter the common law of contracts in this way").

There can be little doubt that the FCC intended for the right of revocation to survive even in situations where initial consent has been contractually provided.  As a threshold matter, there is no support in the 2015 FCC Order to support the *Reyes* opinion's conclusion that the FCC only "considered a narrow question" and thus wished to stop short of providing the right of revocation to persons who provided consent via contract.  *Reyes*, 861 F.3d at 56. On the other hand, there is a great deal of evidence that the FCC strongly disfavors situations such as would be created by *Reyes*, where consumers are "stuck" and cannot revoke. *See, e.g., 2015 TCPA Ruling*, 30 FCC Rcd at 7994 ("[A]n interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA[.]").

Most importantly, the *2015 FCC Ruling* zealously protects the right of the consumer to revoke by "using any reasonable method including orally or in writing," disapproving of any effort to otherwise limit the means of revocation:

> 66. As we have found above, the most reasonable interpretation of "prior express consent" in light of the TCPA's consumer protection goals is to permit a right of revocation. To then interpret the same term to allow callers to designate the exclusive means of revocation would, at least in some circumstances, materially impair that right. For example, if a caller receives a consumer's valid oral consent for certain messages but requires the consumer to fax his or her revocation to the caller, perhaps with additional conditions as to the content of such a revocation, such conditions materially diminish the consumer's ability to revoke by imposing additional burdens—especially if disclosure of such conditions is not clear and conspicuous, and not repeated to the consumer with each message.

> 67. Such a requirement would place a significant burden on the called party who no longer wishes to receive such calls, which is inconsistent with the TCPA. Rather, the TCPA requires only that the called party clearly express his or her desire not to receive further calls. This common-sense understanding of revocation is consistent with the Commission's requiring easy means of

revocation and the notion that "any silence in the statute as to the right of revocation should be construed in favor of consumers," while acknowledging that where Congress has intended that the means of revocation be limited, it has said so clearly. By contrast, granting Santander's request arguably would mean that a caller—even one with actual knowledge that a consumer has revoked previously-given consent—would be free to robocall a consumer without facing TCPA liability, despite the consumer's repeated reasonable attempts to revoke consent.

*Id.* at 7997. The FCC further summed up its ruling on this issue by stating "we clarify that a called party may revoke consent **at any time** and **through any reasonable means**. **A caller may not limit the manner in which revocation may occur**." *Id.* at 7989-90 (emphasis added). To put it succinctly, it is inconceivable that the FCC would find merely limiting the means of revoking consent to be unlawful but would not find the complete elimination of **any** means of revocation, such is at issue with the *Reyes* opinion, at least equally unlawful.

### D.     The Instant Contract Contains No Contractual Restriction on Revocation.

Defendants' suggestion that the Eleventh Circuit's *Osorio* opinion supports their position that businesses can contractually restrict a consumer's right to revoke consent mischaracterizes that court's holding. Defendants, in seizing on dicta in *Osorio* that the plaintiffs, "in the absence of any contractual restriction to the contrary, were free to orally revoke any consent previously given," 746 F.3d at 1255 (emphasis added), confuse agreements as to the *manner* of revocation (e.g., orally) with the wholesale prohibition on the consumer's *ability* to revoke: The Eleventh Circuit was, in actuality, expanding on the fact that "[c]ommon-law notions of consent generally allow oral revocation." *Id.* at 1255.

To the extent that *Osorio's* dicta has any relevance, it predates the *2015 FCC Ruling*[11] and does not support Defendants' attempt to conflate the concept of the mere contractual giving

---

[11]     As explained above, the *2015 FCC Ruling* held that businesses cannot put limitations on the manner in which a consumer revokes consent. *Id.* at 7889-90.

23

of consent for autodialed calls with a contractual **_restriction_** on revocation.[12] This very issue was addressed in _Welch_, 2016 WL 1157043, at *5,  which, in holding that the right to revoke was not waived merely because consent was provided via a contractual provision, stated that "[TCPA Defendant] points to no provision in Ms. Ward's credit card agreement that precludes the oral revocation of her grant of prior express consent. Therefore, under the law of this Circuit, [the plaintiff] was entitled to orally revoke her grant of prior express consent, its embodiment in the written credit card agreement notwithstanding."

Here, the contract at issue similarly contains no language affirmatively prohibiting revocation. Dkt. No. 30-9, Emme Decl. ¶¶ 11-13, Exs. A & B, at p. 2; Dkt. No. 28-1, Defs.' SUMF ¶ 14.  Furthermore, as a point that only adds to the infirmity of Defendants' arguments, this silence at a minimum creates an ambiguity that, under the time-honored principle of _contra proferentem,_ must be construed in favor of Plaintiffs as the non-drafting parties.  _See, e.g., Scibana v. Aspen Woodside Vill., LLC_, No. 07-2443, 2007 WL 4510261, at *3 (N.D. Ohio Dec. 18, 2007) ("ambiguities contained in adhesion contracts are to be construed against the drafter"). Under such terms, therefore, Plaintiffs were permitted to revoke consent to be called.[13]

---

[12]     Notably, this language can readily be explained as merely being an observation in that there was no contractual provision in that case that barred revocation, and, to the extent it is not, such language would clearly be dicta.

[13]     Indeed, the contract itself did contemplate the _consumer_ setting forth the manner of communication. _See_ HODGE-RODRIGUEZ000008 ("**If you elect to receive Statements and other communications electronically**, we may send those Statements and communications **as directed by you**[.]"); _but see 2015 FCC Ruling_, 30 FCC Rcd. at 7997 (prohibiting callers from "limit[ing] the manner in which revocation may occur").

24

### E.        Defendants' Consent Clause is Unconscionable.

Even if the Court were to reject the FCC's rulings as to revocation of consent and the overwhelming bulk of the caselaw, the boilerplate in the unsigned, form adhesion contract[14] Defendants contend conferred irrevocable consent to robocall Plaintiffs into perpetuity is both procedurally and substantively unconscionable, and therefore unenforceable.

"An unconscionable contract clause is one in which there is an absence of meaningful choice for the contracting parties, coupled with draconian contract terms unreasonably favorable to the other party." *Wascovich v. Personacare of Ohio*, 943 N.E.2d 1030, 1035 (Ohio Ct. App. 2010) (citation omitted). Substantive unconscionability goes to the specific terms of the contract, i.e., whether the terms of the contract are commercially reasonable; whereas, procedural unconscionability concerns the formation of the agreement, including the bargaining power of each party and whether there was a voluntary meeting of the minds. *Id.* at 1035. The party challenging a contract as unconscionable must prove a quantum of both procedural and substantive unconscionability; "if more of one is present, then less of the other is required." *DeVito v. Autos Direct Online, Inc.*, 37 N.E.3d 194, 201 (Ohio Ct. App. 2015).[15]

---

[14]     An adhesion contract is a "standard-form contract prepared by one party, to be signed by the party in a weaker position, usu[ally] a consumer, who adheres to the contract with little choice about the terms." *Taylor Bldg. Corp. of Am. v. Benfield*, 860 N.E.2d 1058 (Ohio Ct. App. 2006) (quoting Black's Law Dictionary at 342 (8th Ed. 2004)). "[T]he more standardized the agreement and the less a party may bargain meaningfully, the more susceptible the contract or a term will be to a claim of unconscionability." *O'Donoghue v. Smythe, Cramer Co.*, No. 80453, 2002 WL 1454074, at ¶ 24 (Ohio Ct. App. 2002).

[15]     *See also Nygaard v. Sioux Valley Hosps. & Health Sys.*, 731 N.W.2d 184, 194–95 (S.D. 2007) ("In determining whether a contract is an unenforceable contract of adhesion, this Court looks not only at the bargaining power between the parties but also at the specific terms of the agreement.... Thus, we focus on both "overly harsh or one-sided terms," *i.e.*, substantive unconscionability; and how the contract was made (which includes whether there was a meaningful choice), *i.e.*, procedural unconscionability.") (citations omitted).

Here, Defendants' attempt to impose their form consent terms on Hodge (and Rodriguez, a non-customer), is procedurally unconscionable. It is undisputed that these terms were not negotiated, but instead appear in fine print[16] in the middle of multi-folded document sent to Hodge along with other materials sometime after he submitted his application. Hodge Dep. at 42-43.[17] The "little white fold-out" is unsigned, and Hodge acknowledges that he never read the subject consent provision. Hodge. Dep. at 43-44.  Instead, Defendants claim he agreed to the boilerplate by using the credit cards. Defs.' Mot. at 9. The procedurally unconscionable manner in which this adhesion contract was formatted and presented to Hodge—an unsophisticated consumer—by the sophisticated corporate Defendants did not provide for any meaningful negotiation or meeting of the minds, and it should, therefore, be deemed unenforceable.

But even more critically, the extreme substantive unconscionability of the consent provision cannot be permitted. The consent provision is shockingly overbroad—contemplating not just the consumer's agreement to be called at phone numbers they provide, but at any number or other point of contact Defendants obtain "from a third party such as an employer, friend, family member, another creditor, or person with whom you have done business," or through other unspecified means, "including without limitation, a caller identification system that captures your number." Defs.' Mot. at 5.  There is no limitation on the calling, which the clause provides can be made by any agents, affiliates, contractors, subcontractors, and assignees "on any number" obtained, including using an ATDS or prerecorded voice, even if the consumer

---

[16]     Indeed, during Hodge's deposition, he had a hard time physically reading the fine print. Pls.' SUMF ¶ 12.
[17]     Defendants also contend that the consent provision was made available to Hodge via one of several hyperlinks he purportedly could have accessed during the online application process (he didn't), and a vague reference to other terms being "found in [his] disclosures." Emme Dep. at 56-61; Hodge Dep. at 56.

incurs a cost. *Id.* Defendants interpret this provision as irrevocable—allowing them to robocall Plaintiffs (including non-customer Rodriguez) forever, regardless of requests to stop.

Defendants' attempt to irrevocably strip Plaintiffs—including Rodriguez, a non-customer who never provided her number to them in the first place—of their substantive statutory privacy rights through overbroad boilerplate in an unsigned, form adhesion contract that was never subject to negotiation or even meaningfully presented is unconscionable and should, therefore, be deemed unenforceable (or, at the very least, not interpreted as irrevocable as Defendants contend). This is not an essential term of the credit card agreement, and yet Defendants' position would have it eviscerate the TCPA's protections. The dangerous implications of this position cannot be overstated: From Defendants' viewpoint, every company—from credit card companies to phone and cable providers—is free to make endless amounts of what would otherwise be illegal calls under the TCPA, regardless of the recipient's protestations, simply by throwing in boilerplate consent language in their form terms and conditions. Plaintiffs respectfully submit that public policy and the intent of Congress cannot be so easily cast aside, especially where the provision contemplates permission for what would otherwise be future violations of the consumer's personal privacy rights.[18] *See Skinner*, 2015 WL 4135269, at *3-4 (rejecting defense argument that it could contract around the TCPA, recognizing that, "[i]f they could, one imagines that every company in the nation ... would amend their contracts to require customers to waive every right their customers currently have"). Plaintiffs revoked any consent that may have been provided; this unconscionable provision should be deemed unenforceable and void.

---

[18]     One can consent to an intentional tort—or, in this case, a statutory privacy violation—but that consent remains revocable. *Gager*, 727 F.3d at 271 (citing Restatement (Second) of Torts § 892A, cmt. i (1979)); *but see ODW Logistics, Inc. v. Karmaloop, Inc.*, No. 12-996, 2014 WL 293816, at *6 (S.D. Ohio Jan. 27, 2014) ("A release of a future intentional tort is void as against public policy.") (citation omitted). A tort does not stop being a tort just because its waiver is contemplated in a contract.

27

**F.      Defendants Position that They Can Continue Calling Non-Customer Rodriguez After Being Told to Stop Is Wrong.**

Even assuming that Defendants had permission at one point in time to call Rodriguez' cell phone number in reference to Hodge's accounts, they are wrong that their relationship with Hodge somehow gave them the unlimited ability to robocall Rodriguez—a non-customer with whom they have no relationship—into perpetuity after being told to stop.

It is undisputed that Rodriguez is not a customer of Defendants; she has no contractual or other relationship with Defendants, and she never provided her 7770 Number to them. Pls.' SUMF ¶¶ 8, 14. Rodriguez is the sole, primary user of the 7770 Number; while her husband (as with most couples) may be *reached* through her at the number, Hodge has never even borrowed the phone. Pls.' SUMF ¶ 4. Defendants knew the 7770 Number was Hodge's wife's number when they called it, including because he directly told them so during a call on February 5, 2016. Pls.' SUMF ¶ 24. The TCPA impacts consumers' privacy interests, and it was *Rodriguez*' privacy interests who were being affected when Defendants continued to make autodialed calls to her cell phone.

Thus, whatever "intermediary consent" Defendants claim they had from Rodriguez to call her cell phone by virtue of Hodge providing the 7770 number terminated when they were told to stop calling.[19] Rodriguez was in the zone of interest that the TCPA was intended to protect—consumers whose privacy is being invaded by unwanted calling—and after Plaintiffs requested that calling stop, Defendants' relationship or contractual agreement with Hodge could no longer

---

[19]     Defendants try to make an issue out of the fact that Hodge handled payment and maintenance of Plaintiffs' joint cell phone service account. This is a distinction without a difference. It is undisputed that each Plaintiff each had a distinct cell phone for which they were the sole, primary user, Pls.' SUMF ¶ 4, and the TCPA's prior express consent requirement applies not only to the "subscriber" whose name is on the account, but the "non-subscriber customary user" like Rodriguez who receives the unwanted calls. *2015 FCC Ruling*, at ¶ 74.

have any relevance to their continued, intentional calling of Rodriguez, a non-customer.[20] *See*

*Welch*, 2016 WL 1157043, at *5 ("If Mr. Ward were acting as Ms. Ward's agent for the purpose

of reaching her at that cellular telephone number, then it logically follows that he certainly could

revoke Ms. Ward's prior express consent to be called at that number.").

Additionally, the parties dispute that Plaintiff Rodriguez separately told Defendants to

stop calling her phone on at least three occasions, including on July 7, 2016. Pls.' SUMF ¶ 47.

Irrespective of *Hodge's* requests that Defendants stop calling, there is thus a genuine dispute of

material fact as to what consent Defendants had after *Rodriguez'* do-not-call requests, which

precludes summary judgment as to Defendants' calls to Rodriguez' 7770 Number.

## IV.    CONCLUSION

It is undisputed that Defendants continued to call Plaintiffs after Hodge requested that

they cease all such communications on July 12, 2016. Dkt. No. 30-9, Emme Decl. ¶ 24; Pls.'

SUMF ¶¶ 37, 40, 47. It is also undisputed that the fine print in the unsigned, form contract of

adhesion Defendants contend contemplates infinite automated calls to Plaintiffs does not state

that consent *cannot* be revoked. Dkt. No. 28-1, Defs.' SUMF ¶ 14. Moreover, *Gager*, *Osorio*,

*Van Patten*, and the vast majority of district court decisions to consider the issue—as well as the

past two decades' worth of FCC regulatory precedent (which, again, is binding on this Court

under the Hobbs Act)—confirm that consumers have the right to revoke prior consent under the

TCPA, *including* where consent was initially provided in relation to a contractual agreement like

the one at issue here. These facts, the unconscionability of Defendants' asserted consent

provision, and the applicable law at issue establish that Defendants did not have prior express

---

[20]    The FCC has confirmed that "the consent of one party cannot be binding on another[.]" *2015 FCC Ruling*, at ¶ 78. Thus, even if this Court were to find the consent provision in Defendants' agreement irrevocable and enforceable against Hodge, it cannot be enforceable as to Rodriguez after Defendants were explicitly told to stop calling.

consent to call Plaintiffs after being told to stop, and that they are, therefore, <u>not</u> entitled to judgment as a matter of law.

Moreover, it is undisputed that Defendants knew at least by February 5, 2016 that the 7770 Number belonged to Hodge's wife, not him, and that Rodriguez (1) is not a customer of Defendants, (2) has no contract or other agreement with Defendants, and (3) never provided her phone number to Defendants. Pls.' SUMF ¶¶ 8, 19. Where it is undisputed that Hodge requested that Defendants stop calling the 7770 Number on July 12, 2016, Defendants no longer had prior express consent for calling non-customer Rodriguez' number, and they are, therefore, <u>not</u> entitled to judgment as a matter of law as to such calls. Alternatively, where the parties dispute whether Rodriguez, herself, separately told Defendants to stop calling her 7770 Number on July 7, 2016 and at two other occasions after which she continued to be called, Pls.' SUMF ¶ 47, there is a genuine dispute of material fact that precludes summary judgment.

The Supreme Court "ha[s] repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom…. There simply is no right to force speech into the home of an unwilling listener." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). The nature of unwanted calls to cellular telephones—which consumers carry directly on their person, often at all times—raises even greater privacy concerns. *2015 FCC Ruling*, at ¶ 124. For the foregoing reasons, the Court should deny Defendants' motion for summary judgment and grant summary judgment in Plaintiffs' favor.

Respectfully submitted,

Dated: November 15, 2017

ADRENA RODRIGUEZ and WILLIAM HODGE, individually and on behalf of a class of others similarly situated

By:  _/s/ Gregory S. Reichenbach_____
    Gregory S. Reichenbach (No. 0077876)
    ATTORNEY AT LAW
    P.O. Box 711
    Perrysburg, OH 43552
    Telephone: (419) 529-8300
    Facsimile: (419) 529-8310
    greg@reichenbachlaw.com

    Alexander H. Burke
    BURKE LAW OFFICES, LLC
    155 N. Michigan Ave., Suite 9020
    Chicago, IL 60601
    Telephone: (312) 729-5288
    Facsimile: (312) 729-5289
    aburke@burkelawllc.com

    Justin T. Holcombe
    Kris Skaar
    SKAAR & FEAGLE, LLP
    133 Mirramont Lake Drive
    Woodstock, GA 30189
    Telephone: (770) 427-5600
    Facsimile: (404) 601-1855
    jholcombe@skaarandfeagle.com
    kskaar@skaarandfeagle.com

    James M. Feagle
    SKAAR & FEAGLE, LLP
    2374 Main St., Suite B
    Tucker, GA 30084
    Telephone: (404) 373-1970
    Facsimile: (404) 601-1855
    jfeagle@skaarandfeagle.com

    *Counsel for Plaintiffs*

31

## **L.R. 7.1 CERTIFICATION**

The undersigned certifies that this case has been assigned to the Complex track and adheres to the page limitations set forth in L.R. 7.1(f).

*/s/ Gregory S. Reichenbach*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of November, 2017, the foregoing MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was filed via the Court's CM/ECF system that will serve electronic notice on all counsel of record registered with the e-filing system.

*/s/ Gregory S. Reichenbach*