# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| ADRENA RODRIGUEZ and WILLIAM HODGE, individually and on behalf of a class of others similarly situated, | ) ) ) ) | CASE NO.: 3:16-CV-02541-JGC |
| | ) | Judge James G. Carr |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PREMIER BANKCARD, LLC and FIRST PREMIER BANK, | ) ) ) | |
| Defendants. | ) ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND COMBINED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT AND CITATION TO AUTHORITY ......................................... 2

    A.    Hodge Is Bound by The Terms of The Credit Agreements. ................................... 2

        1.    Hodge Agreed to the Terms of the Credit Agreements by Receiving and Using the Credit Cards. ...................................... 2

            i.    The Credit Agreements were Sent to and Received by Hodge. ................................................................... 3

            ii.   Hodge is Bound to the Terms of the Credit Agreements. ............... 6

        2.    The Credit Agreements' Consent Terms are not Unconscionable. ............. 7

            i.    Plaintiffs' Reliance on Ohio Law to Argue Unconscionability is Without Merit. ....................................... 7

            ii.   The Credit Agreements are not Unconscionable Under South Dakota Law. ........................................................ 9

    B.    Plaintiffs Consented to Receive Calls from Premier at The Numbers. ................. 12

        1.    Hodge Consented to Receive Calls at the 5597 and 7770 Numbers. ........ 12

            i.    The 5597 Number. ........................................................ 13

            ii.   The 7770 Number. ........................................................ 14

        2.    Rodriguez Consented to Receive Calls at the 7770 Number. ................... 15

    C.    Plaintiffs' Attempt to Relitigate Reyes Should Be Rejected. .............................. 17

        1.    The FCC's Prior Orders Do Not Grant Consumers a Right to Unilaterally Revoke Contractually Bargained-For Prior Express Consent. .................................................................. 17

        2.    The Common Law of Contracts was not Displaced by the TCPA or the FCC Orders Interpreting It. .............................................. 22

    D.    Rodriguez Did Not Attempt to Revoke Consent Under The 7770 Number Until July 12, 2016. ................................................................... 26

CONCLUSION .................................................................................................. 28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Am. Copper & Brass, Inc. v. Lake City Indus. Prods.*,
2013 U.S. Dist. LEXIS 97411 (W.D. Mich. July 12, 2013), *aff'd by* 757 F.3d 540 (6th
Cir. 2014) ........................................................................................................................11, 12

*Anderson v. Tenn. Valley Auth.*,
No. 92-5811, 1993 U.S. App. LEXIS 8678 (6th Cir. Apr. 13, 1993) .......................................3

*Astoria Fed. Say. & Loan Ass'n v. Solimino*,
501 U.S. 104 (1991) ..............................................................................................................21, 22

*Baisden v. Credit Adjustments, Inc.*,
813 F.3d 338 (6th Cir. 2016) ........................................................................................................26

*Baker v. Science Applications Int'l Corp.*,
2006 U.S. Dist. LEXIS 68062 (D.S.D. Sept. 21, 2006) ..............................................................9

*Boyd v. Allied Home Mortg. Capital Corp.*,
523 F.Supp.2d 650 (N.D. Ohio 2007) ..........................................................................................9

*Carroll v. Comm'r*,
71 F.3d 1228 (6th Cir. 1995) .........................................................................................................3

*Cincinnati Gas & Elec. Co. v. Westinghouse Elec. Corp.*,
1998 U.S. App. LEXIS 21692 (6th Cir. Sept. 1, 1998) ...............................................................7

*Crosby v. Rohm & Haas Co.*,
480 F.3d 423 (6th Cir. 2007) .........................................................................................................3

*Gager v. Dell Fin. Servs., LLC*,
727 F.3d 265 (3d Cir. 2013) ..................................................................................22, 23, 24, 25

*Hagner v. U.S.*,
285 U.S. 427 (1932) .......................................................................................................................3

*Holcombe v. DIRECTV, LLC*,
159 F. Supp. 3d 1337, 1338 (N.D. Ga. 2016) ...........................................................................11

*In re GroupMe, Inc.*,
29 F.C.C.R. 3442 (F.C.C. Mar. 27, 2014) ("2014 FCC Order") .......................................17, 19

*In re Rules & Regs. Implementing the TCP Act*,
31 F.C.C.R. 9074 (F.C.C. Aug. 11, 2016) ..................................................................................17

*In re Rules & Regulations Implementing the TCP Act of 1991 et al.*,
   30 F.C.C.R. 7961 (F.C.C. July 10, 2015) ("2015 FCC Order") ..................................... passim

*In re Rules & Regulations Implementing the TCPA of 1991*,
   27 F.C.C.R. 15391 (F.C.C. Nov. 29, 2012) ("2012 FCC Order") ...................................17, 19

*In re Rules Implementing the Tel. Consumer Prot. Act of 1991*,
   23 F.C.C.R. 559 (F.C.C. Dec. 28, 2007) ("2008 FCC Order")..................................17, 18, 19

*In re Yoder Co.*,
   758 F.2d 1114 (6th Cir. 1985) ...................................................................................3

*Javitch v. First Union Sec., Inc.*,
   315 F.3d 619 (6th Cir. 2003) ...................................................................................26

*Johnson v. City of Detroit*,
   446 F.3d 614 (6th Cir. 2006) ...................................................................................22

*Kloepper v. Equity Tr. Co.*,
   2012 WL 1998052 (N.D. Ohio June 1, 2012)...........................................................9

*Laird v. Norton Healthcare, Inc.*,
   442 Fed. App'x 194 (6th Cir. 2011) .........................................................................3

*Mais v. Gulf Coast Collection Bureau, Inc.*,
   768 F.3d 1110 (11th Cir. 2014) ...............................................................................26

*Neder v. United States*,
   527 U.S. 1 (1999).....................................................................................................22

*New York State Dept. of Social Services v. Dublino*,
   413 U.S. 405 (1973).................................................................................................21

*Ohio Cas. Ins. Co. v. Hoback*,
   200 B.R. 28 (Bankr. W.D. Ky. 1995) .......................................................................3

*Osorio v. State Farm Bank, F.S.B.*,
   746 F.3d 1242 (11th Cir. 2014) .............................................................19, 23, 24, 25

*Reyes v. Lincoln Auto. Fin. Servs.*,
   861 F.3d 51 (2d Cir. 2017)............................................................................... passim

*Schwalm v. TCF Nat'l Bank*,
   226 F. Supp. 3d 937, 943 (D.S.D. 2016) ..............................................................9, 10

*Schweitzer v. Comenity Bank*,
   866 F.3d 1273, 1275 (11th Cir. 2017) .....................................................................24

     -iii-

*Springston v. Conrail*,
    863 F. Supp. 535 (N.D. Ohio 1994)..................................................................21

*Studio & Partners, s.r.l. v. KI*,
    2008 U.S. Dist. LEXIS 11321 (E.D. Wis. Feb. 14, 2008) ........................................8

*United States v. Texas*,
    507 U.S. 529 (1993)..........................................................................................21, 22

*Van Patten v. Vertical Fitness Grp., Ltd. Liab. Co.*,
    847 F.3d 1037 (9th Cir. 2017) .................................................................................25

*Vasapolli v. Rostoff*,
    39 F.3d 27 (1st Cir. 1994)..........................................................................................8

*Wallace v. Red Bull Distrib. Co.*,
    958 F. Supp. 2d 811 (N.D. Ohio July 23, 2013) ...................................................6, 8

*Webb v. Chase Manhattan Mortg. Corp.*,
    2008 U.S. Dist. LEXIS 42559 (S.D. Ohio May 28, 2008) ....................................3, 4

**OTHER CASES**

*Baldwin v. Nat'l Coll.*,
    537 N.W.2d 14 (S.D. 1995) ..............................................................................9, 12, 13

*Century Bus. Servs., Inc. v. Barton*,
    967 N.E.2d 782 (Ohio Ct. App. 2011) .......................................................................8

*Gartrell v. Gartrell*,
    908 N.E.2d 1019 (Ohio Ct. of App. 2009).................................................................6

*Kernelburner, L.L.C. v. MitchHart Mfg.*,
    765 N.W.2d 740 (S.D. 2009) ....................................................................................6

*Nygaard v. Sioux Valley Hosps.*,
    731 N.W.2d 184 (S.D. 2007) ...............................................................................9, 12

*Rozeboom v. Northwestern Bell Tel. Co.*,
    358 N.W.2d 241 (S.D. 1984) ..................................................................................10

*Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.*,
    453 N.E.2d 683 (Ohio 1983)......................................................................................7

**FEDERAL STATUTES**

15 U.S.C. § 227(b)(3) ....................................................................................................11

**OTHER STATUTES**

S.D. Codified Laws § 53-8-7 ..................................................................................................20, 25

S.D. Codified Laws § 54-11-9 .................................................................................................6, 10

**RULES**

Fed. R. Evid. 803(7)...................................................................................................................27

**REGULATIONS**

7 F.C.C.R.8752, 42 (F.C.C. Sept. 17, 1992) ("1992 FCC Order").............................12, 17, 18, 19

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF CONTRACTS § 287 cmt. a (Am. Law Inst. 1981) ............................25

Defendants Premier Bankcard, LLC ("Premier Bankcard") and First Premier Bank ("First Premier") (jointly, "Premier") file this Reply Brief in support of their Motion for Summary Judgment and Combined Memorandum of Law.[1]

## I.    INTRODUCTION

Premier's Motion should be granted because Plaintiffs failed to raise any genuine issues of fact and because Plaintiffs failed to distinguish this case from *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 56 (2d Cir. 2017).

First, Plaintiffs failed to raise a genuine dispute that the Credit Agreements, which are governed by South Dakota law, controlled the parties' contractual relationship, and that Plaintiff Hodge consented to the terms of the Credit Agreements by using the credit cards issued by First Premier and serviced by Premier Bankcard. Hodge is therefore bound by the terms of the Credit Agreements.

Second, Plaintiffs failed to raise a genuine dispute that Hodge contractually consented to receive calls from Premier at the 5597 Number. Likewise, Plaintiffs failed to raise a genuine dispute that Rodriguez consented to receive calls from Premier at the 7770 Number through the doctrine of intermediary consent, which the FCC and the Sixth Circuit follow. Plaintiffs similarly fail to controvert Premier's undisputed evidence that Rodriguez consented to receive calls at the 7770 Number through an intermediary (her spouse, Hodge). In fact, Plaintiffs only challenge whether Premier is liable for alleged post-revocation calls to the Numbers.

Third, because Plaintiffs failed to distinguish the *Reyes* decision, and because Plaintiffs misinterpret the FCC's prior rulings and underlying law, Premier is not liable for alleged post-revocation phone calls to either Number. Plaintiffs attempt to relitigate *Reyes* here by arguing

---

[1]    Capitalized and abbreviated words used throughout this Reply Brief carry the same meaning as used in Premier's opening brief.

that it is inconsistent with FCC orders and case law from other circuits. The Second Circuit, however, already rejected these same arguments. Moreover, as shown below, *Reyes* is consistent with the FCC's rulings and existing law.

Finally, there is no dispute that Rodriguez did not revoke consent to be called prior to July 12, 2016 – the date on which Hodge allegedly attempted to revoke consent to call the Numbers. First, Rodriguez, through the Hodge, granted Premier a contractual right to call the 7770 Number, which, under *Reyes*, cannot be revoked. Second, Rodriguez failed to rebut Premier's showing that she did not attempt to revoke consent at any point prior to July 12, 2016 (the date Hodge attempted to do so). Because there is no dispute of fact on these issues, the Court should hold, as a matter of law, that Rodriguez did not revoke Premier's contractual right to call the 7770 Number.

Plaintiffs therefore failed to create a genuine dispute of material fact, and Premier is entitled to summary judgment on Plaintiffs' claims.

## II.     ARGUMENT AND CITATION TO AUTHORITY

### A.     Hodge Is Bound by The Terms of The Credit Agreements.

#### 1.     Hodge Agreed to the Terms of the Credit Agreements by Receiving and Using the Credit Cards.

Plaintiffs dispute whether Hodge is bound by the terms of the Credit Agreements and, in particular the Agreements' prior express consent provisions. [Doc. No. 36] at p. 9; [Doc. No. 36-1] at ¶ 12. However, Hodge is indisputably bound to the Credit Agreements for two reasons: (1) the record demonstrates that Premier sent the Credit Agreements to Hodge; and (2) Hodge used the credit cards issued to him, thus making the Credit Agreements binding on him.

i.      *The Credit Agreements were Sent to and Received by Hodge.*

"The common law mailbox rule applies when there is a question regarding whether a document was received by the addressee. The 'proper and timely mailing of a document raises a rebuttable presumption that [the document] is received by the addressee.'" *Laird v. Norton Healthcare, Inc.*, 442 Fed. App'x 194, 198 (6th Cir. 2011) (alteration in original) (quoting *Carroll v. Comm'r*, 71 F.3d 1228, 1232 (6th Cir. 1995)). In fact, courts in this Circuit presume "a properly mailed letter 'reached its destination in usual time and was actually received by the person to whom it was addressed.'" *Webb v. Chase Manhattan Mortg. Corp.*, 2008 U.S. Dist. LEXIS 42559, at *50-51 (S.D. Ohio May 28, 2008) (citing and quoting *Hagner v. U.S.*, 285 U.S. 427, 430 (1932)); *accord Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 430 (6th Cir. 2007). "[T]his rebuttable presumption arises upon proof that the document was 'properly addressed, had sufficient postage, and was deposited in the mail.'" *Laird*, 442 Fed. App'x at 198 (quoting *In re Yoder Co.*, 758 F.2d 1114, 1118 (6th Cir. 1985)).

While testimony of non-receipt may rebut the presumption, *see In re Yoder Co.*, 758 F.2d at 1118, "a bald denial of receipt, without more, is insufficient." *Webb*, 2008 U.S. Dist. LEXIS 42559, at *51 (concluding that testimony such as "'I never received any notices from TFI in the Summer of 2003 about my insurance nor did I receive any correspondence' from Chase until receiving the October 27, 2003 letter" was a "'bald denial' [that] [was] insufficient to rebut the presumption of receipt for summary judgment purposes"); *see also Anderson v. Tenn. Valley Auth.*, No. 92-5811, 1993 U.S. App. LEXIS 8678, at *16 (6th Cir. Apr. 13, 1993) (holding there was "no genuine issue of material fact sufficient to defeat summary judgment . . . raised by Anderson's bald and unsupported denial of receipt of the notice of final decision on his individual discrimination complaint"); *accord Ohio Cas. Ins. Co. v. Hoback*, 200 B.R. 28, 31

(Bankr. W.D. Ky. 1995) ("To allow a simple denial of receipt, standing alone, to rebut the presumption would be to destroy the presumption entirely.").

Here, Plaintiffs claim that, after opening the 2014 Account, Hodge received a document entitled "First Premier Bank Credit Card Contract and Account Opening Disclosures" – *i.e.*, the 2014 Credit Agreement. *See* [Doc. No. 36] at p. 9; [Doc. No. 36-1] at ¶ 12. Plaintiffs further concede that the 2014 Credit Agreement matches the Agreement contained in the record. *Compare* [Doc. No. 36] at p. 9 and [Doc. No. 36-1] at ¶ 12 *with* [Doc. No. 30-8] at ¶ 7.

Plaintiffs, however, claim that "[Hodge] only received [the 2014 Credit Agreement]." *See* [Doc. No. 36-1] at ¶ 12. But Plaintiffs' claim is nothing more than a "bald denial," which is insufficient to rebut the presumption of receipt under governing Sixth Circuit law. *See*, *e.g.*, *Webb*, 2008 U.S. Dist. LEXIS 42559, at *51. Premier sent both the 2014 and 2016 Agreements in the exact same manner. Premier first mailed the 2014 Credit Agreement to Plaintiffs on July 4, 2014, and mailed the 2016 Credit Agreement on March 21**,** 2016, via United States Mail, to Plaintiffs' home address. *See* [Doc. No. 30-9] at ¶¶ 10-13; Supp. Decl. of Darcy Emme ("Supp. Emme Decl."), at ¶¶ 7-10, attached as **Exhibit A**. Additional Credit Agreements were mailed to Plaintiffs on February 3, 2015; February 28, 2015; and February 8, 2016. *Id* at ¶ 7. Neither Credit Agreement was returned as undeliverable or for insufficient postage. *See* [Doc. No. 30-9] at ¶¶ 10-13; Supp. Emme Decl., at ¶¶ 7-10. Accordingly, because Hodge's denial of receipt is an improper "bald denial," this Court should disregard it and presume as a matter of law that Hodge received both the 2014 and 2016 Credit Agreements.

Moreover, the record does not support Plaintiffs' claim that Hodge never received the 2016 Credit Agreement. Specifically, Plaintiffs cite to page 42 of Hodge's deposition to support their argument. [Doc. No. 36-1] at ¶ 12. On that page of his deposition, however, Hodge testifies

only to the 2014 Credit Agreement. *See* [Doc. No. 30-1] at p. 42. With respect to the 2016 Credit

Agreement, Hodge testified as follows:

> 3     Q. Okay. And do you remember receiving
>
> 4     anything that looks like this in the mail, a folded-up
>
> 5     little white package with the second account that you
>
> 6     opened up in 2016?
>
> 7     A. To my knowledge, I have nothing at home
>
> 8     that can justify it. I mean everything that I had, I
>
> 9     literally sent to my lawyer.
>
> .  .  .
>
> 13     Q. Do you remember getting one little white
>
> 14     fold-up package?
>
> 15     A. Yes.
>
> 16     Q. Do you remember which account it came
>
> 17     with, 2014 or 2016?
>
> 18     A. I don't remember.

[Doc. No. 30-1] at p. 44.

Thus, Hodge could not (and cannot) remember whether he received the 2016 Credit

Agreement. He did not, however, ***deny*** receiving it. Therefore, Hodge has not rebutted the

presumption that he received each of the Credit Agreements under the Sixth Circuit's mailbox

rule. When Hodge's inability to remember one way or the other is put next to Premier's evidence

showing that both Credit Agreements were mailed to Hodge, it becomes evident that there is no

genuine issue of fact but rather, that a trier of fact must conclude as a matter of law that Hodge received both Credit Agreements.[2]

### ii.    Hodge is Bound to the Terms of the Credit Agreements.

Under South Dakota law, which governs the Credit Agreements,[3] Hodge's use of the cards constitutes acceptance of the terms of the Credit Agreements. *See* S.D. Codified Laws § 54-11-9 ("[U]se of an accepted credit card or the issuance of a credit card agreement and the expiration of thirty days from the date of issuance without written notice from a card holder to cancel the account creates a binding contract between the card holder and the card issuer . . . ."). It is undisputed that Hodge used both cards – he admits that he used both them. *See*, *e.g.*, [Doc. No. 36] at p. 10; [Doc. No. 36-1] at ¶ 35. Hodge is therefore bound by the terms of both Credit Agreements, including the prior-express-consent provisions. S.D. Codified Laws § 54-11-9.

Significantly, both Credit Agreements contained the following prior express consent provision:

> [Hodge] agree[s] and expressly consent[s] that [Premier] . . . may call or contact [him] at *any* cellular, mobile, home, work, or other telephone number, . . . of any kind whatsoever that (a) *[he] provide[s] or use[s] to contact [Premier]*, (b) *[Premier] obtain[s] from a third party such as an employer, friend, family member, another creditor, or person with whom [he] [has] done business*, or (c) *[Premier] obtain[s] through any legal means . . . .*

---

[2]    Hodge claims that he did not read the terms of the Credit Agreements. *See* [Doc. No. 36] at p. 9; [Doc. No. 36-1] at ¶ 12. However, under both South Dakota and Ohio law, failing to read a contract does not prohibit enforcement of its terms. *See*, *e.g.*, *Gartrell v. Gartrell*, 908 N.E.2d 1019, 1023 (Ohio Ct. of App. 2009) ("[F]ailure to read the terms of a contract is not a defense to the enforcement of the contract."); *Kernelburner, L.L.C. v. MitchHart Mfg.*, 765 N.W.2d 740, 743 (S.D. 2009) ("To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.").

[3]    Both Credit Agreements contain a choice-of-law clause providing that the Credit Agreements shall be governed by South Dakota law. [Doc. No. 30-9] at ¶¶ 11-13, Exs. A & B, p. 1; [Doc. No. 28-1] at ¶ 16; [Doc. No. 36-1] at ¶ 16; *accord Wallace v. Red Bull Distrib. Co.*, 958 F. Supp. 2d 811, 818 (N.D. Ohio July 23, 2013) ("Because the RBNA Agreement contains a choice-of-law clause designating California law, and because Ohio law calls for the clause to be honored, the Court examines the RBNA Agreement under California law.").

[Doc. No. 30-9] at ¶¶ 12-13, Exs. A & B, at p. 2 (emphasis added).

In his deposition, Hodge admitted that the 2014 and 2016 Credit Agreements contain the same prior express consent provision. *See*, *e.g.*, [Doc. No. 30-1] at pp. 42-44 (admitting that, "[h]onestly, [the 2016 Credit Agreement] looks the same as the first"). Hodge has not presented any evidence to rebut the fact that he used both credit cards and is therefore bound by both Credit Agreements. Because Hodge is presumed to have received both Agreements, and because it is undisputed that Hodge used the credit cards, Hodge agreed to be bound by the prior express consent provisions of both Credit Agreements as a matter of South Dakota law. Accordingly, Hodge expressly agreed that Premier could contact any number he provided to them, using any means, including an automatic telephone dialing system.[4]

       2.      <u>The Credit Agreements' Consent Terms are not Unconscionable.</u>

          i.      *Plaintiffs' Reliance on Ohio Law to Argue Unconscionability is Without Merit.*

Under Ohio choice-of–law rules, "the governing law specified in a contract is applied unless the chosen state lacks a substantial relationship to the parties or the transaction or unless the application of the law of the chosen state would be contrary to a fundamental policy of a state with a materially greater interest in the transaction." *Cincinnati Gas & Elec. Co. v. Westinghouse Elec. Corp.*, 1998 U.S. App. LEXIS 21692, at *2 (6th Cir. Sept. 1, 1998) (citing *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.*, 453 N.E.2d 683, 686 (Ohio 1983)).

Here, Plaintiffs argue that this Court should invalidate the prior express consent provisions of the Credit Agreements as procedurally and substantively unconscionable under ***Ohio law***. *See* [Doc. No. 36] at pp. 30-32. However, as discussed above, the Credit Agreements

---

[4]     Premier does not agree that its telephone system constitutes an automatic telephone dialing system under the TCPA and reserves the right to argue that it does not meet the TCPA's definition of such a system should this case proceed past summary judgment.

are governed by **South Dakota Law**. *See, e.g.*, [Doc. No. 30-9] at ¶¶ 11-13, Exs. A & B, p. 1; [Doc. No. 28-1] at ¶ 16; [Doc. No. 36-1] at ¶ 16. Yet, Plaintiffs do not argue that the Credit Agreements are unconscionable under South Dakota law.[5] *See* [Doc. No. 36] at pp. 30-32. Further, Plaintiffs cannot claim that South Dakota "lacks a substantial relationship to the parties or that applying [South Dakota] law would be contrary to a fundamental policy of Ohio[.]" *Wallace*, 958 F. Supp. 2d at 818. Premier is located in South Dakota, *see* [Doc. No. 1] at ¶¶ 5-6 and [Doc. No. 33] at ¶¶ 5-6, and "a party's place of domicile is sufficient to meet Ohio's 'substantial relationship' test." *Wallace*, 958 F. Supp. 2d at 818 (citing *Century Bus. Servs., Inc. v. Barton*, 967 N.E.2d 782, 794 (Ohio Ct. App. 2011)).

Accordingly, Plaintiffs have not presented any compelling reason why this Court should disregard South Dakota law in favor of Ohio law on this issue, or any other. Because Plaintiffs relied on Ohio's law of unconscionability, rather than South Dakota's, Plaintiffs waived this defense by failing to raise it in their opposition brief. *Accord Vasapolli v. Rostoff*, 39 F.3d 27, 36 (1st Cir. 1994) ("Unlike the Emperor Nero, litigants cannot fiddle as Rome burns. A party who sits in silence, withholds potentially relevant information, allows his opponent to configure the summary judgment record, [or] acquiesces in a particular choice of law does so at his peril."); *Studio & Partners, s.r.l. v. KI*, 2008 U.S. Dist. LEXIS 11321, at *32 (E.D. Wis. Feb. 14, 2008) ("The parties' arguments – especially when both sides are represented by counsel – are precisely what frame a court's approach to an issue, and a court should be entitled to rely on what the

---

[5]      In a single footnote of their argument, Plaintiffs briefly cite to a South Dakota decision that lays out, in extremely general terms, some elements of unconscionability under South Dakota law. *See* [Doc. No. 36] at p. 30 n.15. However, this single, offhand cite to South Dakota law does not properly raise or preserve this issue. Plaintiffs' cite (and the body of their argument) contain no discussion of how South Dakota law somehow invalidates the consent provisions of the Credit Agreements, which would be an odd result given the multitude of prior-express-consent provisions courts routinely uphold.

parties argue in their briefs."). Therefore, because Plaintiffs practically ignore South Dakota law, summary judgment should be granted to Premier on this issue.

> ii.    The Credit Agreements are not Unconscionable Under South Dakota Law.

Even if Plaintiffs have not waived their unconscionability arguments by failing to cite South Dakota law, the prior-express-consent provisions of the Credit Agreements are not unconscionable. South Dakota courts define unconscionable contracts to be "[o]ne-sided agreements without a remedy for another party's breach." *Baldwin v. Nat'l Coll.*, 537 N.W.2d 14, 17 (S.D. 1995).[6]

When evaluating the unconscionability of a contract, a South Dakota court may consider both procedural and substantive unconscionability. "The procedural analysis asks how the contract was presented." *Schwalm v. TCF Nat'l Bank*, 226 F. Supp. 3d 937, 943 (D.S.D. 2016). A contract presented to one party on a "take it or leave it" basis is considered an adhesion contract. *Baldwin*, 537 N.W.2d at 18. "An adhesion contract, while not presumptively unconscionable, is construed against the drafting party with 'special scrutiny' to determine if it is unconscionable." *Schwalm*, 226 F. Supp. 3d at 943. A contract is not procedurally unconscionable where the party with less bargaining power may decline to contract with the more sophisticated party and take his or her business "elsewhere." *See id.* (citing and discussing *Baker v. Science Applications Int'l Corp.*, 2006 U.S. Dist. LEXIS 68062 (D.S.D. Sept. 21,

---

[6]    The unconscionability argument would fail under Ohio law as well as it fails to meet the standard for unconscionability for the same reasons as in South Dakota. *See, e.g., Kloepper v. Equity Tr. Co.*, 2012 WL 1998052, at *2 (N.D. Ohio June 1, 2012) ("For a contractual provision to be deemed unconscionable, it must be both substantively unconscionable, where 'the contract terms are so unfair to one party that their enforcement would be unreasonable,' and procedurally unconscionable, where 'there was an absence of meaningful choice or understanding of the terms on the part of one party.'" (quoting *Boyd v. Allied Home Mortg. Capital Corp.*, 523 F.Supp.2d 650, 657 (N.D. Ohio 2007))).

2006)). The substantive analysis asks whether the contracts contain terms that are unreasonable, one-sided, or oppressive. *Nygaard v. Sioux Valley Hosps.*, 731 N.W.2d 184, 195 (S.D. 2007).

Here, Plaintiffs argue that the Credit Agreements' consent provisions are procedurally unconscionable because "the[] terms were not negotiated, but instead appear in fine print in the middle of multi-folded document sent to Hodge along with other materials sometime after he submitted his application[s]." [Doc. No. 36] at p. 31. However, it is undisputed that Hodge had at least three opportunities to decline consent to the Credit Agreements after receiving the prior-express-consent provisions. First, the preapproval letters sent to Hodge contained the consent-to-call provisions in prominent text. *See* [Doc. No. 30-1] at pp. 49, 57-58, Ex. 5, at p.1 (¶ 4) & Ex. 7, at pp. 1 & 3 (¶ 4). Next, Hodge was informed of the provisions when he first applied for credit through Premier's online application portal (*see* [Doc. No. 30-1] at pp. 50-57, Ex. 6, at p. 4). Finally, he received the provisions again after receiving the Credit Agreements in the mail immediately prior to using the credit cards. *See*, *e.g.*, [Doc. No. 30-9] at ¶¶ 10-13; Supp. Emme Decl., at ¶¶ 7-10; *accord* S.D. Codified Laws § 54-11-9.

But though he could have done so,[7] Hodge did not take his business elsewhere after receiving and having the opportunity to read the consent provisions. *See Schwalm*, 226 F. Supp. 3d at 943. Rather, he ***chose*** to do business with Premier and to continue doing so for several years thereafter. Accordingly, because Hodge had multiple opportunities to decline the Credit Agreements but chose instead to become a party to them, the Credit Agreements, including the prior-express-consent provisions, are not procedurally unconscionable under South Dakota law.

---

[7]     Premier Defendants do not hold a monopoly on the credit market, as there are a number of companies that offer credit card options to consumers. *Contrast* this case with *Rozeboom v. Northwestern Bell Tel. Co.*, 358 N.W.2d 241, 245 (S.D. 1984) (invalidating a contract as unconscionable because "th[e] case involve[d] an individual versus a [telecommunications] monopoly" and the consumer did not have the ability to do business with another similar entity).

The Credit Agreements are not substantively unconscionable either. Plaintiffs argue that the Credit Agreements are substantively unconscionable because they allegedly place "no limitation[s] on . . . calling" and allow Premier to "robocall Plaintiffs . . . forever, regardless of requests to stop." *See* [Doc. No. 36] at pp. 31-32. But as discussed above, Hodge and Premier willingly entered into a contractual relationship with Premier. The relationship was not forced on Hodge and, had he wished to have more contractual protections, Hodge could have refused Premier's bargain at any time prior to using the credit cards.

Plaintiffs also rely on an unwarranted "slippery slope" argument that lacks any legal support. Although the parties' Credit Agreements provide Premier with contractual rights to call cellular telephone numbers provided by Hodge, such rights are not unlimited, as Plaintiffs assert. Importantly, once Hodge repays his debt, he may terminate the Credit Agreements and part ways with Premier. At that time, Premier would no longer have a right under the Credit Agreements to call the Numbers. *See*, *generally Holcombe v. DIRECTV, LLC*, 159 F. Supp. 3d 1337, 1338 (N.D. Ga. 2016). Moreover, the record demonstrates that Premier has robust policies and procedures in place to protect the privacy interests of their customers. These policies and procedures, though not contractually required by the Credit Agreements[8] or the TCPA, direct Premier to stop calling their debtors once requested to do so.[9] *See* [Doc. No. 30-9] at ¶¶ 25-29.

---

[8]  Premier's decision to voluntarily cease calling its debtors at their request, per its internal policies and procedures, does not constitute a waiver of their rights under the Credit Agreements or *Reyes*. *See*, *e.g.*, [Doc. No. 30-9], Exs. A & B, at p. 2 ("**No Waiver:** Even if we do not exercise any right we may have against you, we do not intend to waive that right. We can exercise it against you in the future.").

[9]  To the extent Plaintiffs argue, in footnote 18, that a person may revoke consent to an intentional tort, and therefore Plaintiffs can revoke consent here, this misses the mark. First, Plaintiffs offer no definitive authority equating TCPA violations with torts. Second, even assuming a TCPA violation *could be* a tort, no such tort violation occurred here. As a general matter, the TCPA acts much like a strict liability statute. *See* 15 U.S.C. § 227(b)(3); *Am. Copper & Brass, Inc. v. Lake City Indus. Prods.*, 2013 U.S. Dist. LEXIS 97411, at *6 (W.D. Mich. July

---

Finally, Plaintiffs do not cite a single case holding that a prior-express-consent provision in a Credit Agreement is substantively unconscionable. These facts, taken together, make the prior express consent provisions of the Credit Agreements reasonable and not "one-sided" or "oppressive," particularly to the point of being unconscionable. *Nygaard*, 731 N.W.2d at 195; *accord Baldwin*, 537 N.W.2d at 19 (defining "oppressive" as "unreasonably burdensome: unjustly severe, rigorous, or harsh."). Accordingly, the Court should hold that the Credit Agreements are neither procedurally nor substantively unconscionable, and grant summary judgment in favor of Premier.

## B.  Plaintiffs Consented to Receive Calls from Premier at The Numbers.

### 1.  Hodge Consented to Receive Calls at the 5597 and 7770 Numbers.

Plaintiffs claim that there are disputed facts surrounding whether Premier had a right to call the 5597 and 7770 Numbers under the terms of the consent provisions. *See* [Doc. No. 36] at pp. 7-10. These claims are flatly contradicted by the record.[10]

---

12, 2013), *aff'd by* 757 F.3d 540 (6th Cir. 2014) (collecting cases stating that "[t]he TCPA is essentially a strict liability statute"). Thus, assuming *arguendo* that a TCPA violation **can be** a tort, an alleged TCPA violation does not become a traditional "tort" unless it is "willful" or "knowing" – which would classify it as an "intentional tort." However, Plaintiffs have not proven that Premier "willfully" or "knowingly" violated the TCPA in this case. Instead, the record demonstrates that, after Hodge allegedly revoked consent in July 2016, an employee for Premier Bankcard accidentally failed to place a "cease-and-desist" flag on Hodge's Credit Accounts, notwithstanding Premier's robust internal policies and procedures. [Doc. No. 30-9] at ¶¶ 25-26. Premier Bankcard quickly corrected this accidental oversight on August 17, 2016. *Id.* at ¶¶ 25-29. After that date, no additional calls were made to the Numbers. *Id.* Therefore, Premier's conduct never crossed the line into an alleged "intentional tort," as Plaintiffs argue.

[10]  Throughout their brief, Plaintiffs implicitly argue that Hodge could not consent to receive calls at the Numbers simply by giving such Numbers to Premier. To the extent Plaintiffs intend to make this argument, it fails under the express language of the FCC's 1992 and 2015 TCPA orders. *See In re Rules & Regulations Implementing the TCP Act of 1991 et al.*, 30 F.C.C.R. 7961, 7990-7992 (F.C.C. July 10, 2015) ("2015 FCC Order") (finding that a called party's "express consent [to be called] can be demonstrated . . . by giving his or her wireless number to the person initiating the autodialed or prerecorded call" (citing 7 F.C.C.R.8752, 42 (F.C.C. Sept. 17, 1992) ("1992 FCC Order")).

        *i.*       *The 5597 Number.*

It is undisputed that Hodge consented to receive calls at the 5597 Number, per the Credit Agreements' consent provisions, by providing the Number to Premier on multiple occasions. For example, Plaintiffs and Premier agree that Hodge disputed charges made on the July 2014 Account through an "Affidavit of Unauthorized Use," also referred to as the March 2015 Dispute Letter, which he faxed directly to Premier Bankcard. *Compare* [Doc. No. 36] at p. 8 *with* [Doc. No. 30-9] at ¶¶ 16-18, Ex. C. It is also undisputed that the March 2015 Dispute Letter contained the 5597 Number. *Id.*

Further, the parties agree that, in February 2016, Hodge contacted Premier Bankcard to report that he lost the credit card associated with the July 2014 Account. [Doc. No. 30-9] at ¶ 19; *accord* [Doc. No. 30-1] at pp. 66-69; [Doc. No. 30-2] at Ex. 2. During this phone call, Hodge orally consented to receive calls from Premier at the 5597 Number. *Id.* Plaintiffs do not dispute this fact either. *See* [Doc. No. 36] at p. 8. Plaintiffs also concede that Hodge submitted the 5597 Number to Premier when he applied for the March 2016 Credit Account.[11] *See* [Doc. No. 36] at pp. 8-9; [Doc. No. 30-9] at ¶¶ 20-21, Ex. D, at p. 2.

Thus, the undisputed facts prove that Hodge submitted the 5597 Number to Premier on at least three different occasions: March 2015, February 2016, and March 2016. That is significant because the Credit Agreements expressly state that Hodge consented to receive calls at any

---

[11]    Though Plaintiffs claim that "Hodge did not intentionally provide [the 5597 Number] in his [March 2016] application," claiming instead that the Number was "prepopulated," this argument lacks evidential support. Premier has provided evidence that the 5597 Number was ***not*** prepopulated in the March 2016 application. *See* [Doc. No. 30-9] at ¶¶ 20-21, Ex. D, at p. 2 (showing Hodge's application inputs); *accord* Supp. Emme Decl., at ¶ 14. Plaintiffs have not disputed this evidence with any contrary evidence of their own. Accordingly, Plaintiffs' prepopulated number theory is meritless. Nevertheless, ***even if*** the 5597 Number ***was*** prepopulated in the March 2016 application, Hodge had had an opportunity to review the application before submitting it. By submitting the application with the 5597 Number listed in it, Hodge consented to Premier contacting him at the 5597 Number.

number he "provide[ed] or use[ed] to contact" Premier or that Premier "obtain[ed] through any legal means." [Doc. No. 30-9] at ¶¶ 11-13, Exs. A & B, at p. 2. Therefore, because it is undisputed that Hodge provided Premier with the 5597 Number on three occasions, Premier is not liable for any calls that were made to the 5597 Number as a matter of law.

ii.    *The 7770 Number.*

The undisputed evidence also shows that Hodge consented to receive calls at the 7770 Number. On October 2, 2014, Hodge listed the 7770 Number as a contact number for him when he updated his information on Premier's website. [Doc. No. 30-9] at ¶ 14. This entry by Hodge triggered Premier's website to update the July 2014 Account with the 7770 Number as an appropriate contact number for Hodge.[12] *Id.* at ¶¶ 14-15. Later, in February 2016, Hodge again provided the 7770 Number to Premier as an appropriate number at which to contact him when he reported a lost credit card associated with the 2014 Account. [Doc. No. 30-9] at ¶ 19; *accord* [Doc. No. 30-1] at pp. 66-69; [Doc. No. 30-2] at Ex. 2. During this phone call, Hodge orally consented to receive calls from Premier at the 7770 Number. [Doc. No. 30-9] at ¶ 19; *accord* [Doc. No. 30-1] at pp. 66-69; [Doc. No. 30-2] at Ex. 2, at p. 2-3. Finally, in March 2016, Hodge

---

[12]    Plaintiffs dispute whether Hodge supplied the 7770 Number to Premier in October 2014. *See* [Doc. No. 36] at p. 8 n.1. Plaintiffs' basis for disputing this evidence is a citation to Darcy Emme's 30(b)(6) deposition for Premier. *Id.* Based on the deposition, Plaintiffs claim that Premier first acquired the 7770 Number through a "credit bureau" report. *Id.* However, Plaintiffs' reliance on Ms. Emme's deposition is misplaced because they ignore the fact that Ms. Emme subsequently clarified her testimony in an errata sheet. *See* Errata Sheet, Emme Deposition ("Errata Sheet"), at pp. 1-3, a true and accurate copy of which is attached as **Exhibit B**. In her Errata Sheet, Ms. Emme clarified her 30(b)(6) testimony by explaining that further investigation of this issue revealed that Premier acquired the 7770 Number through Hodge's voluntary submission in October 2014 – not via receipt from a credit bureau report. *Id.*; *accord* Supp. Emme Decl., at ¶¶ 11-13. Because of their reliance on the unrevised deposition transcript, Plaintiffs have produced no evidence to rebut Premier's showing that Hodge voluntarily supplied them with the 7770 Number through their website in October 2014.

again submitted the 7770 Number to Premier when he applied for the March 2016 Credit Account.[13]

Accordingly, the record demonstrates that Hodge submitted the 7770 Number to Premier on at least three different occasions: October 2014, February 2016, and March 2016. That is significant because the Credit Agreements expressly state that Hodge consented to receive calls at any number he "provide[ed] or use[ed] to contact" Premier or that Premier "obtain[ed] through any legal means." [Doc. No. 30-9] at ¶¶ 11-13, Exs. A & B, at p. 2. Because it is undisputed that Hodge provided Premier with the 7770 Number on three occasions, Premier is not liable for any calls that were made to the 7770 Number either.[14]

2.  Rodriguez Consented to Receive Calls at the 7770 Number.

The record also demonstrates conclusively that Rodriguez, through Hodge, provided intermediary consent to Premier to call the 7770 Number to reach Hodge, even though Plaintiffs claim that Rodriguez was the customary user of that number. *See*, *e.g.*, [Doc. No. 36] at pp. 33-34. Plaintiffs admit that both Hodge and Rodriguez frequently used each other's cellphone numbers as secondary contact numbers with multiple third parties, such as with doctors, utilities, employers, and others. *See* [Doc. No. 36-1] at ¶¶ 30-34; *accord* [Doc. No. 30-1] at pp. 18-19, 21; [Doc. No. 30-2] at pp. 15-17 ("We're married, so when it comes to putting my number down on, let's say a doctor's office, we've always been able to do that with each other so we have a second contact just in case his doctor's office needs to contact him . . . ." (emphasis added)); *accord*

---

[13]  Like with the 5597 Number, Plaintiffs claim that "Hodge did not intentionally provide [the 7770 Number] in his [March 2016] application," claiming instead that the Number was "prepopulated." [Doc. No. 36] at pp. 8-9. This assertion fails for the same reasons discussed in footnote 11, *supra*.

[14]  Though Plaintiffs claim that Rodriguez allegedly "revoked" Premier's right to call the 7770 Number prior to July 12, 2016, this claim lacks merit, as will be discussed in Section II.D., *infra*.

[Doc. No. 30-2] at p. 19 (testifying that it would be "understandable" for Hodge to use the 7770 Number as his secondary contact number).

Further, to the extent Plaintiffs argue that Premier should not have called the 7770 Number because "Rodriguez . . . informed Hodge that the calls she was receiving in relation to his Premier accounts were a nuisance and that she . . . instructed Hodge to tell Premier to stop calling," this evidence does not indicate that Hodge actually revoked consent to call the 7770 Number. *See* [Doc. No. 36-1] at ¶¶ 40, 47. Plaintiffs cite no authority supporting their assertion that, when Rodriguez privately requested that Hodge make "Premier stop calling," her words automatically voided Premier's right to call the 7770 Number without Hodge (or Rodriguez for that matter) ever mentioning such revocation to Premier. Further, Rodriguez admits that she did not even know that the 7770 Number was tied to the Credit Accounts until it was already done – thus, she could not have revoked her intermediary consent from Hodge before he gave the 7770 Number to Premier. *See* [Doc. No. 36] at p. 12 (admitting that Rodriguez did not know Hodge opened the Credit Accounts and provided the 7770 Number as a secondary contact number until he had already done so).[15] Indeed, it would be a very odd (and unworkable) result to hold that one spouse could revoke consent issued to a third-party simply by telling their spouse, and then hold the third-party liable for not having knowledge of a private, inter-spousal communication. But that is the exact argument Plaintiffs make here.

---

[15]    It is also worth pointing out that Hodge is the "subscriber" on the PagePlus Account, and therefore had the ability to freely give the 7770 Number to Premier if he wished. *See* 2015 FCC Order, 30 F.C.C.R. at 8001 ("[T]he subscriber . . . or the non-subscriber customary user of a telephone number included in a family . . . calling plan. . . . can give prior express consent to be called at [a] number.").

In sum, there is no genuine issue of fact or law regarding whether Hodge was permitted to give the 7770 Number to Premier as a secondary contact number under the intermediary consent doctrine. Premier is therefore entitled to summary judgment on this issue.[16]

**C.    Plaintiffs' Attempt to Relitigate *Reyes* Should Be Rejected.**

Plaintiffs go to great lengths to relitigate the Second Circuit's *Reyes* decision using prior FCC orders and other authorities that the Second Circuit already addressed in *Reyes*. *See* [Doc. No. 36] at pp. 13-29. Indeed, *Reyes* relied on the exact same FCC orders Plaintiffs cite in reaching its decision. But even if the Second Circuit had not already rejected Plaintiffs' arguments, they would fail as a matter of law, for the reasons set forth below.

1.    <u>The FCC's Prior Orders Do Not Grant Consumers a Right to Unilaterally Revoke Contractually Bargained-For Prior Express Consent.</u>

Plaintiffs argue that prior FCC orders provide consumers with "an unqualified right to revoke their prior consent to be autodialed on their cell phones through any reasonable means." [Doc. No. 36] at p. 14. Such a right simply does not exist under the plain language of the FCC orders, particularly as it relates to collection calls where consent is part of a bargained-for exchange. Indeed, it would be shocking for the FCC to attempt to overrule centuries of contract law in this way by providing that a party could unilaterally revoke part of the consent forming the basis of a contract.

None of the FCC orders cited by Plaintiffs discuss a consumer's ability to revoke consent in the context of a "bargained-for" exchange or contract.[17] *See*, *generally*, 1992 FCC Order, *supra*; *In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. 559 (F.C.C.

---

16      To the extent Plaintiffs argue that, under the 2015 FCC Order, "the consent of one party cannot be binding on another," *see* [Doc. No. 36] at p. 34 n.20, Premier addressed that argument in footnote 7 of its opening brief. *See* [Doc. No. 28] at p. 24 n.7.

17      Plaintiffs also briefly cite to a 2016 FCC order. *See* [Doc. No. 36] at p. 16 (citing *In re Rules & Regs. Implementing the TCP Act*, 31 F.C.C.R. 9074, 9090 (F.C.C. Aug. 11, 2016)). That order does not address bargained-for consent either.

Dec. 28, 2007) ("2008 FCC Order"); *In re Rules & Regulations Implementing the TCPA of 1991*, 27 F.C.C.R. 15391 (F.C.C. Nov. 29, 2012) ("2012 FCC Order"); *In re GroupMe, Inc.*, 29 F.C.C.R. 3442 (F.C.C. Mar. 27, 2014) ("2014 FCC Order"); 2015 FCC Order, *supra*. Thus, contrary to Plaintiffs' argument, the FCC has not squarely addressed this issue, as the *Reyes* court held following a detailed examination of these same FCC orders. *See Reyes*, 861 F.3d at 56-58. Because *Reyes*' holding does not contradict the orders in any way, this Court should refuse to relitigate its holding and instead follow the Second Circuit's well-reasoned analysis. Moreover, for the following reasons, the FCC Orders on which Plaintiffs rely are fully consistent with the holding of *Reyes*.

Plaintiffs first argue that the 1992 FCC Order established a right to "revoke consent to any future *solicitations* . . . *from a telemarketer*."[18] [Doc. No. 36] at p. 14 (citing 1992 FCC Order, 7 F.C.C.R. at 8766 n.47) (emphasis added). On its face, this regulation only applies to telemarketers, not creditors attempting to collect a debt. Indeed, the FCC noted that this rule was designed to "mandate procedures for establishing company-specific do-not-call lists . . . ." 1992 FCC Order, 7 F.C.C.R. at 8766. "Do-not-call" lists are not at issue here, and the 1992 FCC Order has no relevance to this case or the *Reyes* holding.

Second, Plaintiffs rely on the 2008 FCC Order. *See* 2008 FCC Order, 23 F.C.C.R. at 564-65. The 2008 Order, however, supports the *Reyes* holding, not Plaintiffs' novel argument. Specifically, the FCC found "that autodialed and prerecorded message calls to wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express

---

[18]      *Accord* 2008 FCC Order, 23 F.C.C.R. at 565 ("[W]e agree . . . that calls solely for the purpose of debt collection are not telephone solicitations and do not constitute telemarketing. . . . [C]alls regarding debt collection or to recover payments are not subject to the TCPA's separate restrictions on 'telephone solicitations.'").

consent' of the called party . . ." and such persons have consented to calls "at the number which they have given, absent instructions to the contrary." *Id.* at 564.

Plaintiffs seize on the FCC's "absent instructions to the contrary" language. [Doc. No. 36] at p. 6. That language can easily be made consistent with *Reyes* by limiting instructions to the contrary to instructions contained in the contract itself.[19] Plaintiffs also ignore the fact that the "instructions" at issue ***are incorporated*** into the Parties' bargained-for Credit Agreements. Because the common law of contracts does not permit ***unilateral*** modification or revocation of the other party's contractual rights, Plaintiffs may only give "instructions to the contrary" in the contract itself – not in a post-contractual request unsupported by new consideration. Thus, neither Premier nor Plaintiffs can give "instructions to the contrary" without either (1) breaching the Credit Agreements; or (2) mutually assenting to new terms through either a superseding contract or a novation. Neither of these circumstances have occurred here. Therefore, the 2008 FCC Order also does not contradict *Reyes* in any way.[20]

Third, like the 1992 FCC Order, the portion of the 2012 FCC Order on which Plaintiffs rely only applies to text messages and a requirement to permit an opt-out of future texts.[21] [Doc. No. 36] at p. 15 (citing 2012 FCC Order, 27 F.C.C.R. at 15398). Specifically, it is limited to "those situations in which a consumer has previously provided . . . prior express consent to be

---

[19]    For example, some creditors expressly permit a consumer a right to revoke as a matter of contract. That is example of an "instruction to the contrary" that survives *Reyes*.

[20]    By its express terms, the 2008 FCC Order only applies telephone numbers given to creditors in *an application for credit* – it does not apply to prior express consent that is given as part of the *consideration underlying an agreement* to extend credit. *See* 2008 FCC Order, 23 F.C.C.R. at 564 ("We conclude that the provision of a cell phone number to a creditor, *e.g.,* as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt.").

[21]    Further, the 2012 FCC Order is not entitled to any deference by this Court. *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1256 (11th Cir. 2014) ("[The 2012 FCC Order] is not dispositive of the present case . . . because the ruling may not have been promulgated with the requisite meaningful review to invoke *Chevron* deference.").

sent text messages from the sender and later receives a text confirming a request to opt-out of future messages . . . ." 2012 FCC Order, 27 F.C.C.R. at 15398. The Order has **nothing** to do with consent to receive collection calls that serves as consideration to a bargained-for exchange in a credit agreement. Further, the portion of the 2014 FCC Order on which Plaintiffs rely, which discusses a consumer's consent to communications absent "instructions to the contrary," should be disregarded for the same reasons discussed above with respect to the 2008 FCC Order. Namely, it only applies to unilateral consent, not consent that forms part of a contract.

Finally, Plaintiffs rely on the 2015 FCC Order to argue that they have an unequivocal and unilateral right to revoke their consent to be called under the Credit Agreements at any time. *See* [Doc. No. 36] at pp. 15-16, 24-28. Specifically, Plaintiffs argue that the 2015 Order "squarely addressed the statutory right to revoke consent" and is directly applicable to this case because the FCC found that (1) "consumers may revoke consent through any reasonable means" and (2) "callers may not control consumers' ability to revoke consent." *Id.* at pp. 15-16, 24-28 (emphasis added). Plaintiffs' reading of the 2015 Order is far too broad, and it was already rejected by the Second Circuit in *Reyes*.

Like the other FCC decisions cited by Plaintiffs, the 2015 Order does not address the issue raised in this case – *i.e.*, whether a borrower may unilaterally revoke consent contained in a bargained-for contract. But *Reyes* did address this question, and held that a borrower cannot revoke such consent. *See Reyes*, 861 F.3d at 56 ("[Reyes's] appeal presents a different question, **which has not been addressed by the FCC**: whether the TCPA also permits a consumer to unilaterally revoke his or her consent . . . when that consent is given, not gratuitously, but as bargained-for consideration in a bilateral contract." Emphasis added.).

The *Reyes* holding not only answers a question not addressed by the FCC, it is consistent with existing state common law. For example, under South Dakota law, parties to a contract do not have the right to unilaterally modify or revoke another party's contractual rights, such as the right to contact the other party in a contractually agreed manner. *See*, *e.g.*, S.D. Codified Laws § 53-8-7.

Further, with respect to the FCC's second finding, Premier did not (and is not) "control[ling] [Plaintiffs'] ability to revoke consent." Specifically, as discussed in Section II.A., *supra*, Hodge and Premier *voluntarily* entered into the Credit Agreements. *Id.* Hodge had multiple opportunities to walk away from the credit transaction, but chose not to do so. *Id.* Therefore, Premier and Hodge *mutually agreed* to limit Plaintiffs' ability to revoke the prior express consent provisions via contract – specifically, by mutually agreeing to be bound by the Agreements' prior express consent provisions. Premier, in turn, agreed to extend credit to Hodge, and the right to contact him regarding payment formed part of the consideration for this extension of credit. Consequently, because the parties *mutually agreed* to limit Plaintiffs' right to revoke consent via their contract, and in exchange for Premier extending credit to Hodge, Premier did not unilaterally "control" Plaintiffs' right to revoke in the manner described by the FCC. Thus, the 2015 FCC Order does not apply to this case and it does not contradict or limit *Reyes*.

For these reasons, this Court should follow *Reyes* and reject Plaintiffs' effort to unilaterally modify their contract to revoke consent, as it was part of the underlying consideration.

2.    The Common Law of Contracts was not Displaced by the TCPA or the FCC Orders Interpreting It.

The *Reyes* decision is also consistent with the presumption that Congress "legislate[s] against a background of common-law . . . principles." *Astoria Fed. Say. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). A federal statute enacted after a common law doctrine has been established will not abrogate the common law rule unless the statute "speak[s] directly to the question addressed by common law." *United States v. Texas*, 507 U.S. 529, 534 (1993). Indeed, "a court must begin with the presumption that . . . state law is valid. 'It will not be presumed that a federal statue was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so.'" *Springston v. Conrail*, 863 F. Supp. 535, 538 (N.D. Ohio 1994) (quoting *New York State Dept. of Social Services v. Dublino*, 413 U.S. 405 (1973)).

"While the [TCPA] requires that any party wishing to make live or prerecorded calls obtain prior express consent, the statute is silent as to whether a party that has so consented can subsequently revoke that consent." *Reyes*, 861 F.3d at 56. Plaintiffs argue that the TCPA's silence on this issue means that the FCC create a statutory right to revoke consent in all contexts, thereby overriding state common law on unilateral revocation of contractual consideration. *See* [Doc. No. 36] at pp. 15, 21, 24-26. However, a federal regulatory agency cannot create personal federal rights; instead, that power is left exclusively to Congress. *See*, *e.g.*, *Johnson v. City of Detroit*, 446 F.3d 614, 629 (6th Cir. 2006). Thus, the FCC may only grant an unequivocal right to revoke consent under the TCPA where Congress directly endorses that action. *See id.*

Here, Plaintiffs offer nothing to show that, by passing the TCPA, Congress intended to override the common law of contracts and create a right of consumers to unilaterally revoke consent, even where doing so would be a revocation of the underlying contractual consideration.

Plaintiffs likewise fail to point to any language in the TCPA where Congress "speak[s] directly" to the issue of revoking consent. *Texas*, 507 U.S. at 534. Indeed, the very cases on which Plaintiffs rely for this argument recognize that Congress was silent on this issue. *Accord Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 272 (3d Cir. 2013) ("[T]he TCPA is silent as to whether the revocation right exists . . . .").

Because Congress was silent on the revocation issue, this Court must presume that Congress "legislate[d] against a background of common-law . . . principles" regarding revocation of consent. *Solimino*, 501 U.S. at 108; *accord Reyes*, 861 F.3d at 56-57 ("[W]hen Congress uses a term, such as 'consent,' that has 'accumulated [a] settled meaning under . . . the common law, a court must infer . . . that Congress means to incorporate the established meaning of th[at] term[]." (alterations in original) (quoting *Neder v. United States*, 527 U.S. 1, 21 (1999)). And, as a result, the Court must also presume the FCC interpreted the term "consent" against a similar common law backdrop, instead of exceeding its regulatory authority by creating new federal rights, as Plaintiffs argue. *See* [Doc. No. 36] at pp. 25-26; *accord Reyes*, 861 F.3d at 58 (holding that if the FCC's definition of "consent" is broadly applied across the tort and contract spectrum, then the FCC would override the entire law of contracts throughout the nation and, "[a]bsent express statutory language to the contrary, [courts] cannot conclude that Congress intended to alter the common law of contracts in this way").

To that end, the FCC relied on the reasoning from cases in the Third and Eleventh Circuits to interpret revocation rights under the TCPA in the 2015 Order. *See* 2015 FCC Order, 30 F.C.C.R. at 7993-7997; *Reyes*, 861 F.3d at 56; *see also Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255 (11th Cir. 2014); *Gager*, 727 F.3d at 272. In *Gager*, the Third Circuit held that the plaintiff could revoke her prior express consent after defaulting on a loan agreement. 727

F.3d at 267-68. By allowing the plaintiff to revoke her prior consent, the *Gager* court reasoned that "consent," as defined under the common law, is traditionally considered to be revocable. *Id.* at 270. However, the court's broad pronouncement is limited by its facts. There, the plaintiff had only consented to receive calls in the ***application*** for the line of credit on which she had defaulted. *Id.* There is no discussion in *Gager* about the plaintiff's consent being part of a "bargained-for" exchange with the defendant, or as consideration for her line of credit. 727 F.3d at 267-68. Rather, because the *Gager* plaintiff's consent was "not given in exchange for any consideration, [or] incorporated into a binding legal agreement," the *Gager* court held that her consent was voluntarily given and could, therefore, be voluntarily revoked under the common law. *Reyes*, 861 F.3d at 57; *see also Gager*, 727 F.3d at 267-71. Thus, because *Gager* did not involve consent as contractual consideration, it does not conflict with *Reyes*, and has no application here.

The Eleventh Circuit adopted the Third Circuit's reasoning in *Osorio*, holding that a plaintiff, who had similarly consented to receive calls from the defendant in a credit *application*, could revoke her consent. 746 F.3d at 1253. *Osorio*, however, expressly declined to address whether a borrower has a right to revoke contractual consent: "Osorio, ***in the absence of any contractual restriction to the contrary***, [was] free to orally revoke any consent previously given . . . ."[22] *Id.* (emphasis added). In *Schweitzer v. Comenity Bank*, another case that does not involve contractual consideration, the Eleventh Circuit again held plaintiff may only revoke "absent a contractual restriction to the contrary."[23] 866 F.3d 1273, 1275 (11th Cir. 2017); *see also Reyes*

---

[22]     Contrary to Plaintiffs' argument, this holding is not *dicta*. By including the emphasized language, the Eleventh Circuit limited its holding to the facts at issue − *i.e.*, a transaction that did not include prior express consent as part of the bargained-for consideration underlying the parties' contract. Thus, the Eleventh Circuit expressly left this issue open for a later decision.

[23]     Plaintiffs also argue that this alleged *dicta* from *Osorio* and *Schweitzer* should be

861 F.3d at 56 (holding that *Osorio, Gager,* and the 2015 FCC Order did not address contractual consent).

Thus, the 2015 FCC Order and the other cases Plaintiff cites deal only with the "narrow question" of "whether the TCPA allows a consumer who has freely and unilaterally given his or her informed consent to be contacted can later revoke that consent." *Reyes*, 861 F.3d at 56. That question is not at issue here, as Plaintiffs provided contractual – not unilateral – consent. *See id.* ("consent is given, not gratuitously, but as bargained-for consideration in a bilateral contract.") Thus, Plaintiffs' reliance on *Gager* and *Osorio* is misplaced.

Because this case involves contractual consent, the Court must look to the common law of contracts, not torts. *See Reyes*, 861 F.3d at 57. As *Reyes* held, "'[c]onsent' . . . is not always revocable under the common law. A distinction in this regard must be drawn between tort and contract law. In tort law, 'consent' is generally defined as a gratuitous action, or a voluntary yielding to what another proposes or desires. . . . [However,] consent to be contacted by telephone . . . [that is] included as an express provision of a contract . . . is not [unilaterally] revocable." *Id.*[24] This holding is consistent with the common law in South Dakota, which requires "mutual assent" between the contracting parties to modify or revoke contractual rights. *See, e.g.*, S.D. Codified Laws § 53-8-7; *accord Reyes*, 861 F.3d at 57 ("It is black-letter law that one party may not alter a bilateral contract by revoking a term without the consent of a counterparty." (citing RESTATEMENT (SECOND) OF CONTRACTS § 287 cmt. a (Am. Law Inst.

---

disregarded under the 2015 FCC Order. However, the *Schweitzer* decision was issued in 2017, and repeated the same language from *Osorio*. *Schweitzer* thus did not deviate from the limitation in *Osorio*; to the contrary, it adhered to it even after the 2015 FCC Order.

[24] Because "consent to be contacted. . . [that is] included as an express provision of a contract . . . is not revocable" as a matter of law (absent breach or mutual assent to the contrary), *Reyes*, 861 F.3d at 57, Plaintiffs' assertion that they were free to revoke consent because "the instant contract contains no contractual restriction on revocation" is incorrect. *See* [Doc. No. 36] at pp. 28-29.

1981) (requiring "assent by the other party" before a proposed alteration to a contract becomes valid)).

No federal circuit court has applied the *Gager* holding to contracts in the way suggested by Plaintiffs.[25] For this reason, *Reyes* is not an aberration; it is fully consistent with centuries of common law. And only *Reyes* – not *Osorio, Schweitzer, or Gager* – address a right to revoke contractual consent. Because it is the only decision on point, this Court should follow it, and hold that Plaintiffs do not have a right to unilaterally revoke their express contractual consent.

### D.    Rodriguez Did Not Attempt to Revoke Consent Under The 7770 Number Until July 12, 2016.

In the final section of their opposition brief, Plaintiffs attempt to create an issue of fact regarding the date on which Rodriguez revoked consent to call the 7770 Number. This argument fails for several reasons.

First, the argument fails because Plaintiffs could not revoke consent under the Credit Agreements, as discussed above. Rodriguez agreed to be bound by its provisions when Hodge acted as her intermediary and consented to Premier calling the 7770 Number. *See*, *e.g.*, *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 344 (6th Cir. 2016) (adopting intermediary consent doctrine in TCPA context); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11th Cir. 2014) (same). Once Hodge bound her to the Credit Agreements' consent provisions as her intermediary, Rodriguez could no longer attempt to revoke consent – either by herself or through Hodge as an intermediary (because Hodge had no right to revoke either). *See*, *e.g.*,

---

[25]    The only other circuit holding cited by Plaintiffs is *Van Patten v. Vertical Fitness Grp., Ltd. Liab. Co.*, 847 F.3d 1037, 1048 (9th Cir. 2017), in which the Ninth Circuit concluded that, under similar circumstances as *Gager* and *Osorio*, a consumer may revoke prior express consent to be called. Notably, however, this case also involved a "voluntary" application – not a binding contract for which consent acted as consideration. Further, the *Van Patten* court did not even **mention** *Reyes*, much less reject its reasoning. Therefore, the *Van Patten* case is similarly distinguishable from the present circumstances.

*Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) ("[A] nonsignatory may be bound to an . . . agreement under ordinary contract and agency principles.").

Second, even if Rodriguez could revoke consent, which she cannot, she has not supplied any evidence demonstrating that she revoked consent prior to July 12, 2016, which is the date on which Hodge attempted to revoke consent for both Numbers. Plaintiffs argue that "Rodriguez separately told Defendants to stop calling her phone on at least three occasions, including on July 7, 2016." [Doc. No. 36] at p. 34. To support that assertion, Plaintiffs rely on Rodriguez's deposition testimony. However, the deposition demonstrates that Rodriguez made only bald, self-serving assertions to suggest that she told Premier to stop calling her. *See*, *e.g.*, [Doc. No. 30-2] at p. 49 ("A. I told my husband and First PREMIER to have them stop calling my phone repeated times, plenty of times. Q. Do you remember any of those times? A. To be honest with you, no. I couldn't give you dates. I couldn't give you the very first time I told them when to stop calling my phone.").

Premier, on the other hand, has submitted actual evidence demonstrating that Rodriguez never made these requests. *See* [Doc. No. 30-9] at ¶ 30 ("There is no record in Premier's possession indicating that Rodriguez ever contacted Premier and requested that Premier cease-and-desist calling the 7770 Number."). Under the Federal Rules of Evidence, this testimony is sufficient to show that Rodriguez never made such requests. *See* Fed. R. Evid. 803(7) (allowing a showing of an "absence of a record" to demonstrate that a "matter did not occur"). Plaintiffs agree that there is no record of Rodriguez's calls. *See* [Doc. No. 36-1] at ¶ 47. Therefore, Premier is entitled to summary judgment holding that Rodriguez did not revoke consent prior to July 12, 2016, either personally or through Hodge.

## CONCLUSION

A key condition of Hodge's Credit Agreements with Premier was his consent to be called at any number he provided for collection and account-related calls. Because this consent was a term of a bilateral contract, Hodge cannot unilaterally revoke it. Premier therefore respectfully requests that the Court award summary judgment in its favor and dismiss Plaintiffs' claims.

*OF COUNSEL:*

GRAYDON HEAD & RITCHEY LLP
312 Walnut Street
Suite 1800
Cincinnati, OH 45201-4060
Phone: (513) 621-6464
Fax:    (513) 651-3836

Respectfully submitted,

*/s/ Kara A. Czanik*
Kara A. Czanik (0075165)
John B. Pinney (0018173)
GRAYDON HEAD & RITCHEY LLP
7759 University Drive, Suite A
West Chester, OH 45069
Phone: (513) 629-2746
Fax:    (513) 755-9588
E-mail: kczanik@graydon.law

and

Stefanie H. Jackman, *pro hac vice*
Daniel L. Delnero, *pro hac vice*
Ballard Spahr LLP
999 Peachtree Street NE, Suite 1000
Atlanta, GA 30309-3915
Phone: (678) 420-9490
Fax:    (678) 420-9301
E-mail: jackmans@ballardspahr.com
        delnerod@ballardspahr.com

*Counsel for Defendants Premier Bankcard, LLC
and First Premier Bank*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of December, 2017, the foregoing Reply Brief in Support of Defendants' Motion for Summary Judgment and Combined Memorandum of Law was filed via the Court's CM/ECF system that will serve electronic notice on all counsel of record.

<div align="center" style="text-align:left; margin-left:50%">

*/s/ Kara A. Czanik*
Kara A. Czanik (0075165)

</div>