**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Adrena Rodriguez, *et al.*,                                        Case No. 3:16CV2541

                    Plaintiffs,

          v.                                                                    **ORDER**

Premier Bankcard, LLC, *et al.*

                    Defendants.

This case concerns the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227.

Plaintiffs Adrena Rodriguez and William Hodge accuse defendants, Premier Bankcard LLC, and First Premier Bank (collectively, "Premier") of using an automated dialing system to repeatedly call their cellular telephones without prior express consent. Defendants claim they had prior express consent–consent they maintain Hodge could not later revoke under the terms of his credit card agreements.

Pending is defendants' motion for summary judgment (Doc. 28), which plaintiffs oppose (Doc. 36). For the reasons that follow, I grant the motion in part, and deny it in part.

**Background**

Plaintiffs are a married couple.

They maintain a cell phone account in Hodge's name through provider Page Plus. (Doc. 36-1, ¶ 2). Hodge is primarily responsible for managing the account and pays the monthly bill through his credit card or bank account. (*Id.* ¶ 6).

Each spouse has his or her own cell phone: Hodge's number ends in 97 and Rodriguez's ends in 70. (Doc. 36-1, ¶ 4). Plaintiffs generally do not use one another's phones, but will provide each other's number as a secondary contact when completing an application, or filling out forms for a doctor or public utility. (*Id.* ¶¶ 4, 30; Doc. 43-2, ID 656-57).

In July 2014, and March 2016, Hodge applied for and received two credit cards from First Premier in his own name. (Doc. 36-1, ¶ 8). Hodge used the accounts exclusively; he did not name Rodriguez as an authorized user, because she preferred to carry cash. (Doc. 43-3, ID 780). Premier Bankcard serviced the credit accounts on behalf of First Premier Bank. (Doc. 30-9, ¶ 8).

After approving Hodge's applications, First Premier issued him two cards, and two credit card agreements. (Doc. 30-9, ¶ 10). Both agreements included the following consent to call provision:

> **<u>Consent to calls and messages using autodialer, prerecorded message and artificial voice:</u>** You agree and expressly consent that we and our agents, affiliates, contractors, subcontractors and assignees may call or contact you at any cellular, mobile, home, work, or other telephone number, electronic mail address, or other digital or electronic communication terminal, link, point or address of any kind whatsoever that (a) you provide or use to contact us, (b) we obtain from a third party, such as an employer, friend, family member, another creditor, or person with whom you have done business, or (c) we obtain through any legal means, including without limitation, a caller identification system that captures your number. You expressly consent to receiving calls, text messages and other communications from us, our agents, affiliates, contractors, subcontractors and assignees on any number that is assigned to a cellular telephone service, wired telephone service, paging service, facsimile machine, specialized mobile radio service, radio common carrier service, internet protocol service, or other electronic, digital or analog service that is placed through or utilizes an automatic telephone dialing system, artificial voice or pre-recorded message, or any other technology, even if you incur a cost when we contact you. You accept responsibility for all costs you incur when contacted through any of these means.

(Doc. 30-9, ¶ 11-13; Doc. 43-1, ID 627-31).

The agreements did not state how, or whether Hodge could revoke his consent to be contacted, but specified that the "terms of [Hodge's] credit account will be governed by the laws of South Dakota and applicable federal law." (Doc. 43-1, ID 627, 630).

Hodge initially applied for the 2014 account using a prior cell phone number not at issue in this dispute. (Doc. 36-1, ¶ 33). Over the life of his accounts, however, Hodge gave defendants the 97 and 70 numbers multiple times.

First, in October 2014, Hodge updated the 2014 account online, adding the 70 number–Rodriguez's cell phone number–as a contact number. (Doc. 30-9, ¶¶ 14-15). Later, in March 2015, Hodge disputed charges on the 2014 account through an "Affidavit of Unauthorized Use," listing the 97 number as his "cell phone" on the affidavit. (*Id.* ¶¶ 17-18; Doc. 43-1, ID 634).

Then, in February 2016, Hodge contacted Premier Bankcard to report that he lost the card associated with the 2014 account. (Doc. 37, ID 515). During the phone call, he confirmed to a Premier customer representative that defendants could contact him at the 97 number, and at his "wife's number," ending in 70. (*Id.*).

Finally, when he applied for the March 2016 account, Hodge again offered both his number and his wife's number among his "contact" information, listing the 97 number in the "cell phone" field and 70 number in the "home phone" field of the application. (Doc. 30-9, ¶ 20).[1]

Hodge "didn't get [Rodriguez's] permission or ask her personally" on any of the occasions he disclosed her number to defendants, but "just assumed . . . it would be okay" with her. (Doc. 43-2, ID 660).

---

[1] Plaintiffs concede that Hodge provided both numbers in his application for the 2016 account, but claim that he did not "intentionally" submit Rodriguez's number, because "if anything," the 70 number was "prepopulated" in the online application. (Doc. 36-1, ¶¶ 26-27). Whether the cell phone numbers appeared "prepopulated" is irrelevant; Hodge still intentionally submitted an application to First Premier that included both numbers.

Hodge fell behind on his payments shortly after opening the 2016 account. (Doc. 36-1, ¶ 36). Looking to collect on the balance, Premier Bankcard began calling Hodge's 97 number, and Rodriguez's 70 number using an automatic dialing system. (*Id.* ¶ 37).

Following one call on May 19, 2016, Rodriguez told Hodge to contact Premier "and ask them, you know, have them call your phone," rather than her phone. (*Id.* at ¶ 40; Doc. 43-3, ID 793). Hodge testified that he contacted Premier at some point after her request, but could not recall whether he asked defendants to stop calling the 70 number at the time. (Doc. 43-2, ID 669-72). Premier has no record of receiving such a call on or around May 19, 2016.

Defendants' automated calls continued into June and July of 2016. (Doc. 36-1, ¶ 37). Rodriguez first asked a Premier representative to stop calling her number on July 7, 2016–a day she remembered, as she was in the hospital giving birth when she received the call. (Doc. 43-3, ID 804-07). Premier evidently disputes this claim, because it has no record of the July 7 phone call.

Both parties agree, however, that Hodge asked Premier to stop contacting both numbers during a phone call on July 12, 2016. (Doc. 36-1, ¶¶ 38-40; Doc. 37, ID 521). They also agree that Premier did not honor his request. Defendants' procedures called for the Premier representative who spoke with Hodge to put a "cease-and-desist flag" on Hodge's accounts to prevent future calls to either number. (Doc. 36-1, ¶ 39). But for whatever reason, he did not.

In what defendants describe as a "one-off error," the employee failed to make note of Hodge's request. (*Id.* ¶ 40). Premier continued to contact plaintiffs regularly for another month, until Hodge again asked a customer representative to stop calling on August 17, 2016. This time, the employee followed proper procedures and defendants made no further calls to plaintiffs. (*Id.* ¶¶ 40-42).

Plaintiffs thereafter filed this suit. (Doc. 1).

As I interpret their complaint, Hodge and Rodriguez each state individual TCPA claims against defendants based on Premier's calls to their respective cell phones. (*See id.* ¶¶ 28, 29, 34, 36, 42 (allegations regarding calls to Rodriguez)). Plaintiffs also seek to recover under the Act as part of a nationwide class.

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. Once the movant carries its burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the nonmovant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Discussion

"The TCPA regulates the use of certain technology when placing calls to consumers." *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 341–42 (6th Cir. 2016) (footnote omitted). Specifically, the Act prohibits the use of "any automatic telephone dialing system or an artificial or prerecorded voice" to call a cell phone number without obtaining the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). Consumers who receive these prohibited calls have a private right of action for money damages of "at least $500 per violation." *Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 548 (6th Cir. 2015) (citing 47 U.S.C. § 227(b)(3)(B)).

To succeed on their TCPA claims, Hodge and Rodriguez must demonstrate that: "(1) a call was placed to a cell or wireless phone, (2) by the use of any automatic dialing system and/or leaving an artificial or prerecorded message, and (3) without prior [express] consent of the recipient." *Brown v. Hosto & Buchan, PLLC*, 748 F. Supp.2d 847, 859 (W.D. Tenn. 2010) (citation omitted). "Express consent," to be clear, "is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).

Defendants in this case believe they have carried that burden.

Relying on the consent to call provisions in the credit card agreements, defendants argue Hodge gave them "prior express consent" to contact both numbers, which he used to transact business related to the 2014 and 2016 accounts. They further maintain that Hodge's consent also precludes Rodriguez's TCPA claim under two alternate theories.

First, Premier claims that because Hodge is the subscriber to the 70 number–that is, the consumer assigned to the number, and the individual billed for the call–he "was entitled to grant prior express consent for Premier" to call the number, "notwithstanding the fact that his wife might [have been] the customary user." (Doc. 28, ID 267).

Under this theory, whether Rodriguez herself agreed to the calls is irrelevant. Defendants were entitled to act on Hodge's permission, as it is "'reasonable for callers to rely' on 'consent to receive robocalls' from either type of called party." *Leyse v. Bank of Am., N.A.*, 804 F.3d 316, 327 n.15 (3d Cir. 2015) (quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 8000–01 (2015) *aff'd in part and vacated in part in ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018)).

Second, defendants contend that insofar as they were required to obtain Rodriguez's permission, they obtained it, because "Hodge had authority to provide prior express consent" on his wife's behalf "under the doctrine of intermediary consent," (Doc. 28, ID 267), as set out in the Sixth Circuit's *Baisden* decision.

*Baisden* involved a pair of patients who gave a healthcare provider consent to release their "health information"–defined to include their personal contact information–"to [the] companies who provide[d] billing services" for the healthcare provider. 813 F.3d at 341, 347. When the plaintiffs failed to pay for their services, collections agents contacted them via the cell phone numbers they disclosed to the provider.

Based on the FCC's rulings, and another Circuit Court's decision in similar case, *see Mais v. Gulf Coast Collections Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014), the Court of Appeals agreed that the patients had given "prior express consent" to receive the calls because the TCPA "make[s] no distinction between directly providing one's cell phone number to a creditor and taking steps to *make that number available* through other methods," including through a third-party intermediary. *Baisden*, *supra*, 813 F.3d at 346.

Mapping *Baisden* onto the facts here, Rodriguez stands in for the patients, and Hodge for the healthcare provider who passed their cell phone numbers onto the bill collectors–i.e., Premier. Premier's liability therefore turns on whether Rodriguez consented to Hodge's disclosure, or (as defendants would have it), whether Hodge had authority to consent on Rodriguez's behalf, despite having never sought express permission to disclose her number.

Finally, although Premier continued calling plaintiffs for roughly a month after plaintiffs first asked it to stop,[2] defendants argue these calls do not violate the Act.

Premier maintains that Hodge bargained away his right to revoke consent in the credit card agreements, and "the TCPA does not permit a party who agrees to be contacted as part of a bargained-for exchange to unilaterally revoke that consent," *Reyes v. Lincoln Automotive Fin. Servs.*, 861 F.3d 51, 56 (2d Cir. 2017), even where, as here, the credit card agreements do not address revocation. Defendants also appear to believe that insofar as Hodge conveyed "intermediary consent" to be contacted on Rodriguez's behalf, she too is bound by a revocation waiver implicit in the credit card agreements.

I consider each argument in turn.

### A. Hodge Gave Premier "Prior Express Consent" To Call Both Numbers

First, I agree that Hodge consented to receive automated calls at both numbers.

Under the rulings of the Federal Communications Commission, which "shape the law in this area,'" *Baisden*, *supra*, 813 F.3d at 342 (citation, ellipsis, and brackets omitted), a creditor does not violate the TCPA "when it calls a debtor who has 'provided his number in connection with an existing debt.'" *Hill*, *supra*, 799 F.3d at 551 (quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 564 (2008) (brackets omitted)). Hodge provided Premier the 97 and 70 numbers "in connection with an existing debt" (i.e., the 2014 and 2016 accounts) several times over.

---

[2] Plaintiffs claim that they asked Premier to stop calling early on–at some unknown point after May 19, 2016, (the date Rodriguez asked Hodge to contact Premier) or, at the latest, on July 7, 2016, (the date Rodriguez testified that she asked a Premier employee to stop contacting her while she was in the hospital giving birth). Defendants claim Hodge asked them to stop calling for the first time on July 12, 2016.

Debtors "'typically' give their cell[]phone number 'as part of a credit application,'" *id.* at 552 (citation omitted), just as Hodge did when he applied for the 2016 account. In the online application, Hodge listed his number as his "cell phone," and his wife's number as his "home phone." (Doc. 30-9, ¶ 20). And "the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at the number regarding the debt." 23 FCC Rcd. at 564.

This disclosure alone therefore proves that Hodge gave Premier "prior express consent" to contact both numbers. *Baisden*, *supra*, 813 F.3d at 342–43 (citing 47 U.S.C. § 227(b)(1)(A)(iii)). But on top of that, he made others.

"Importantly . . . while debtors 'typically give their cellphone number . . . at the beginning of the debtor-creditor relations, it doesn't *have* to be that way.'" *Id.* at 344 (quoting *Hill*, 799 F.3d at 552). A debtor may also give his "prior express consent" at a later point in the relationship if, in a context related to the underlying debt, "he gives a company his number before it calls him." *Id.* (citation and brackets omitted). In this case, Hodge did that.

In addition to providing both numbers in the 2016 application, Hodge gave Premier Rodriguez's number in October 2014, as his contact number for the 2014 account, and later provided his own cell phone number when disputing charges on an "Affidavit of Unauthorized Use." (Doc. 43-1, ID 634). Plaintiff also verbally confirmed to a Premier customer representative that defendants could contact him at both numbers when he called to report a lost card in February 2016.[3]

---

[3] Consent over the phone is no less effective than consent pursuant to a credit card agreement–the TCPA "requires only 'prior express consent'; it does not require that consent to be in writing." *Sartori v. Susan C. Little & Assoc., P.R.*, 571 F. App'x 677, 683 (10th Cir. 2014) (citing 47 C.F.R. § 64.1200(a)(1)).

What is more, defendants informed Hodge they would use the 97 and 70 numbers to contact him in the consent to call provisions of the credit agreements, stating: "You agree and expressly consent that we and our agents, affiliates, [etc.] may call or contact you at any cellular, mobile, home, work or other telephone number . . . of any kind whatsoever that . . . you provide or use to contact us." (Doc. 43-1, ID 628, 631). Hodge further agreed that Premier could "utilize[] an automatic telephone dialing system, artificial voice or pre-recorded message" to facilitate the calls. (*Id.*).

And although plaintiffs question whether Hodge in fact received both credit card agreements,[4] whether he did or not is ultimately beside the point, because "TCPA-engendered consent–in the form of [Hodge] providing his telephone number–is beyond the scope of [any] contract." *Patterson v. Ally Fin., Inc.*, 2018 WL 647438, *5 (M.D. Fla. 2018).

"[P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." 23 FCC Rcd. at 564 (quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 872, 8769 (1992)). This is so even where there is no underlying agreement between the parties. *See Hill*, *supra*, 799 F.3d at 552 (defining "prior express

---

[4] Insofar as it matters, defendants have demonstrated that Hodge received both agreements. First Premier employee Darcy Emme attests that First Premier sent each agreement to Hodge "as part of its standard business practice when issuing a new credit account." (Doc. 30-9, ¶ 10). Plaintiffs counter that Hodge "received only one such" agreement, relating only to the 2014 account. (Doc. 36-1, ¶12). As proof, they point to Hodge's deposition testimony, wherein Hodge states that he "d[id]n't remember" whether First Premier sent him a second agreement for the 2016 account. (Doc. 43-2, ID 680-82). But not remembering is not enough to generate an issue of fact. Vague "testimony about matters the deponent 'cannot remember' does not withstand" a properly-supported motion for summary judgment. *Guba v. Huron Cty.*, 2016 WL 3952119, *12 (N.D. Ohio 2016) (citation omitted). The "mere possibility" that First Premier deviated from its usual practice and issued only one, rather than two, credit card agreements is not evidence on which a jury could reasonably find for plaintiffs. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

consent" pursuant to the FCC's rulings, not the "express written consent" forms the plaintiff signed in connection with his mortgage); *Nigro v. Mercantile Adjustment Bureau, LLC*, 769 F.3d 804, 806–07 (2d Cir. 2014) (per curiam) (applying the FCC's rulings to consumer plaintiff's conduct in a case not involving an underlying contract).

"Indeed . . . consent under the TCPA is not a matter of contract, nor subject to contract principles." *Ginwright v. Exeter Fin. Corp.*, 280 F. Supp.3d 674, 683 (D. Md. 2017) (citation and brackets omitted). A consumer who provides his cell phone number "to a creditor in connection with an existing debt" gives his "prior express consent" under the Act because the FCC says he does, not because a credit agreement tells him so. *Baisden*, *supra*, 813 F.3d at 342, 345 (citations omitted).

Here, defendants have shown that Hodge gave Premier the 97 and 70 numbers "before it called him." *Hill*, *supra*, 799 F.3d at 552. That proves consent regardless of whether Hodge received the credit card agreements.

Defendants have therefore carried their burden to demonstrate that Hodge expressly consented to receive automated calls at both numbers.

### B. How Hodge's Consent Impacts Plaintiffs' TCPA Claims

The TCPA prohibits defendants from making "any call (other than a call . . . made with the *prior express consent of the called party*) using any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A) (emphasis added).

No one disputes that Hodge was a "called party." He was the named subscriber on the Page Plus account for both numbers *see, e.g.*, *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 643 (7th Cir. 2012); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251–52 (11th Cir. 2014), "the

person who answer[ed]" a number of Premier's calls, *Leyse*, *supra*, 804 F.3d at 325 n.13, and the individual Premier actually intended to reach.

Thus, setting aside for the moment whether he could later revoke that consent, Hodge's "prior express consent is a complete defense to [his] TCPA claim." *Van Patten*, *supra*, 847 F.3d at 1044. A closer question, though, is whether Hodge's consent is also a complete defense to *Rodriguez*'s TCPA claim.

Premier does not contend that Rodriguez must be a "called party" in order to pursue a TCPA action. As "a regular user of the phone line . . . being called," moreover, she "undoubtedly has the sort of interest in privacy, peace, and quiet that Congress intended to protect" even if she is not one. *Leyse*, *supra*, 804 F.3d at 326. I could therefore agree that she "has statutory standing without first concluding that [s]he is a 'called party.'" *Id.* at 325.

In defining the scope of Rodriguez's claim, however, and the extent to which Hodge's conduct might preclude it, determining whether she is a "called party" with authority to give, or withhold, her own "prior express consent" is instructive. 47 U.S.C. § 227(b)(1)(A).

In this regard, I note persuasive authority interpreting "called party" have not limited the term exclusively to "the person subscribing to the called number at the time the call is made," or the intended recipient of the call. *Soppet*, *supra*, 679 F.3d at 643; *Leyse*, *supra*, 804 F.3d at 325 n.13. To the contrary, "the TCPA nowhere indicates that caller intent is relevant to the definition of 'called party,'" "nor does it include modifiers such as 'intended' that would clarify its meaning." 30 FCC Rcd. at 8001–03.

The FCC, for example, has concluded that the "called party" is *either* the subscriber to a particular phone number, or, "*the non-subscriber customary user of a telephone number included*

*in a family or business calling plan.*" *Id.* at 8000–01 (emphasis added).[5] Defining "called party" to include customary users accords with the common-sense understanding of the phrase–namely, the party that receives the call, whether or not she happens to pay for the phone line.

"Suppose Smith, trying to reach Jones, dials the number with a typo and [accidentally] reaches Perkins . . . No colloquial user of English would call Jones rather than Perkins the 'called party.'" *Soppet*, *supra*, 679 F.3d at 641; *see also Leyse*, *supra*, 804 F.3d at 325 n.13, 327 n.15 (the "called party" may refer to the non-subscriber customary user, or "the person who answers the call"). "The TCPA's legislative history buttresses this [broader] interpretation, stating that it is the 'receiving party'–not the intended party–that consents to the call." 30 FCC Rcd. at 8001.

Under this reasoning, Rodriguez is the "called party" for TCPA purposes as the customary user of the 70 number and the recipient of a number of Premier's automated calls, even though she is neither the subscriber, nor the person defendants meant to contact.

As the facts here demonstrate, a single cell phone number can be associated with more than one "called party." A number included in a subscriber's calling plan may, for instance, have a separate customary user "such as a close relative on a subscriber's family calling plan on an employee on a company's business calling plan." 30 FCC Rcd. at 8001.

---

[5] The Court of Appeals for the District of Columbia granted in part, and denied in part, petitions for review of the FCC's decision. *ACA Int'l*, *supra*, 885 F.3d at 706–09. Applying the Administrative Procedure Act's arbitrary-and-capricious standard, it found the FCC's definition of "called party" "permissibl[e]," *id.* at 706, but vacated a related portion of the Agency's ruling regarding the treatment of "reassigned numbers"–i.e., whether a caller should face TCPA liability when it calls a number formerly assigned to a consenting party, which the cell phone provider has reassigned to a non-consenting party. "In the event of a reassignment, the [debt collector] caller might initiate a phone call . . . based on a mistaken belief that the owner of the receiving number has given consent, when in fact the number has been reassigned to someone else from whom consent has not been obtained." *Id.* at 705. Because the court did not find the FCC's "called party" ruling itself arbitrary or capricious, I regard this portion of the FCC's decision as persuasive.

Customary users enjoy the same authority "to control the calling to and from" a particular cell phone number that subscribers do, "including granting consent to receive robocalls." 30 FCC Rcd. at 8001. And debt-collecting callers, in turn, are entitled to rely on consent from these customary users in a good-faith effort to comply with the Act.

According to the FCC, "it reasonable for callers to rely on customary users, such as a close relative on a subscriber's family calling plan . . . because the subscriber will generally have allowed such customary users" to give prior express consent as the customary user sees fit. *Id.* "To require callers to ignore consent received from customary users in this context would undermine the full benefits of [family] calling plains for such users and place additional unwanted burdens on the actual subscribers." *Id.* at 8002

Of course, instead of a customary user agreeing to be contacted without the knowledge of the subscriber, this case involves the opposite situation: Hodge, the subscriber to the 70 number, and the one "billed for the call" *id.* at 8001, consented to receive Premier's automated messages, whereas Rodriguez, the customary user, did not.

What happens then, when one "called party" gives prior express consent to contact a certain number, and another doesn't?

To my knowledge, only two authorities have addressed this issue: the FCC and the Third Circuit. Both agreed that it is "'reasonable for callers to rely' on 'consent to receive robocalls' from either type of called party,"–meaning either the subscriber, or the non-subscriber customary user can give prior express consent. *Leyse*, *supra*, 804 F.3d at 327 n.15 (citing 30 FCC Rcd. at 8001–02). By this logic, because Hodge and Rodriguez are both called parties, "consent from either would shield [Premier] from liability" in a suit brought by the other. *Id.*

That means defendants' first theory is correct; Hodge's consent precludes Rodriguez's claim, regardless of whether she ever personally gave prior express consent. *See id.* (noting in dicta that "consent from either" the subscriber or non-subscriber customary user "would shield [the debt-collecting caller] Bank of America from liability").[6]

Plaintiffs insist otherwise.

They note that under the FCC's rulings, one party generally "cannot provide consent on behalf of another party," particularly where the underlying consent has not "actually been obtained." *Baisden*, *supra*, 813 F.3d at 343 (quoting 30 FCC Rcd. at 790–91). And Rodriguez claims that Hodge did not "actually . . . obtain" permission to offer up her cell phone number to defendants.

---

[6] Although this means I need not consider defendants' alternate theory–that Hodge gave "intermediary consent" on Rodriguez's behalf under *Baisden*–I note Premier's argument in this regard is seriously flawed. Defendants claim the present dispute is "substantially similar to *Mais*," an Eleventh Circuit case cited in *Baisden*, wherein the plaintiff's wife completed hospital admission forms on behalf of her husband when he sought emergency room care. (Doc. 28, ID 267-68). When the plaintiff failed to pay for hospital services, the hospital passed his contact information onto a bill collector. The *Mais* court affirmed that the bill collector had the plaintiff's prior express consent to be contacted, in view of the FCC's recognition that "consent can be obtained and conveyed via an intermediary." *Mais*, *supra*, 768 F.3d at 1123. As Premier sees it, "the Eleventh Circuit did not question the fact that [the] plaintiff's wife had implied authority to supply the plaintiff's cell phone number to the hospital on his behalf." (*Id.*). But the Eleventh Circuit did not have to question that fact–the forms the wife signed specified that she was giving consent *on the plaintiff's behalf*, since he was the patient admitted to the hospital. *See id.* at 1113 ("Mark Mais sought emergency room treatment . . . . On behalf of her ill husband, Laura Mais completed and signed admissions documents, which she gave to a Hospital representative."). By signing the forms, the *Mais* spouse not only gave her husband's prior express consent to be contacted, she committed him to paying for the care he received.

The same is not true here. Only Hodge is a party to the credit card agreements; he did not, for example, bind Rodriguez to pay his Premier credit card bills. *Baisden* permits a creditor to pass a consumer's cell phone number onto a third party for collection purposes, just as First Premier Bank did when it gave Hodge's information to Premier Bankcard. It does not permit Premier to hold Rodriguez to a non-existent revocation waiver in a pair of credit card agreements to which she is not a party.

The evidence on whether Hodge had his wife's consent to disclose her number is decidedly mixed. Rodriguez testified that Hodge "can give [her] number out" as he sees fit, since he "pays the [cell phone] bill," but added that he should do so only if it is "absolutely needed." (Doc. 43-3, ID 795). Hodge admitted he did not ask Rodriguez's permission to disclose her number, but "assumed it would be okay," because he often lists her number as a "secondary" contact for "doctors' offices" or utility providers. (Doc. 43-2, ID 660, 656-57).

In an "aggressively disputed TCPA case," moreover, the question of consent–whether between the consumer and the caller, or between the subscriber and the customary user of a particular cell phone number–is "ordinarily a factual issue" for the jury. *Ammons v. Ally Fin., Inc.*, __ F. Supp.3d__, 2018 WL 3134619, *10 (M.D. Tenn. 2018); *Osorio*, *supra*, 746 F.3d at 1253–54.

But plaintiffs miss the point. Hodge's consent precludes Rodriguez's claim not because he actually obtained her consent and then conveyed it to Premier, but because Hodge, as a fellow "called party," had an equal right to give his own prior express consent to be contacted at the 70 number. Premier was entitled to rely on Hodge's consent, since the "caller in this situation cannot reasonably be expected to divine that the consenting person is not" the number's customary user, "or to then contact [the customary user] to receive additional consent." 30 FCC Rcd. at 8001–02.

Indeed, notwithstanding earlier rulings declaring "that the consent of one party cannot be binding on another," the FCC has "recognized" that this may be one instance in which the consent of one called party *can* "bind[]" the other, simply as a matter of practical necessity.[7] *Id.* at 8003;

---

[7] In so doing, the Agency envisioned the reverse scenario, with the non-subscribing customary user as the called party giving prior express consent thereby "bind[ing] the subscriber." *See* 30 FCC Rcd. at 8003 ("Moreover, interpreting 'called party' to mean 'intended party' would be inconsistent with recent Commission decisions that the consent of one party cannot be binding on

*see also Leyse*, *supra*, 804 F.3d at 327 n.15 (where two persons "both qualify as 'called parties,'" "consent from either would shield [the caller] from liability"). Such an outcome "fulfills Congress's intent that the TCPA not prohibit normal business communications and is consistent with the Commission's finding that providing one's phone number evidences prior express consent to be called at that number, absent instructions to the contrary." 30 FCC Rcd. at 8002 (footnotes omitted).

Consistent with the FCC's reasoning, I agree that Premier may assert Hodge's consent as a defense against Rodriguez's claim, even if she herself did not give prior express consent to be called at the 70 number, or otherwise permit Hodge to disclose it.

### C. Hodge Can Revoke "Prior Express Consent"

While Hodge gave Premier prior express consent to contact both numbers, he later attempted to revoke that consent.

Defendants' summary judgment motion therefore turns on whether Hodge had a right to withdraw his consent to Premier's automated calls, or whether, as defendants contend, the TCPA does not "permit[] a consumer to unilaterally revoke his or her consent to be contacted . . . when that consent is given, not gratuitously, but as bargained-for consideration in a bilateral contract," *Reyes*, *supra*, 861 F.3d at 56, even if that contract does not specify that consent is irrevocable.

### 1. Authority Permitting Revocation

"It is undisputed that consumers who have consented to receiving calls otherwise forbidden by the TCPA are [generally] entitled to revoke consent." *ACA Int'l*, *supra*, 885 F.3d at 709.

---

another; we recognize, however, that the consent of a customary user of a telephone number may bind the subscriber." (footnotes omitted)).

While the Sixth Circuit has not addressed the issue, "the Third and Eleventh Circuit Courts of Appeals have held that consent is revocable under the TCPA pursuant to the guidance of the FCC and relevant common law principles." *Ammons*, *supra*, 2018 WL 3134619 at *10 (citing *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013); and *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255 (11th Cir. 2014)). Defendants' position also implicitly concedes that prior express consent is ordinarily revocable–after all, Premier does not claim that Hodge lacked the right to revoke his consent, but that he bargained away that right via the credit card agreements.

The FCC issued its most detailed guidance on revocation in a 2015 declaratory ruling.

A petitioner bank, Santander Consumer USA, had asked the FCC "whether a caller can designate the exclusive means by which consumers must revoke consent." 30 FCC Rcd. at 7996. Santander wanted to require that its customers revoke consent in writing, as "allowing oral revocation" could "put[] defendant callers at a disadvantage in 'he said, she said' situations." *Id.* at 7998. "In other words, Santander wanted the FCC to sanction its imposition of written revocation conditions, presumably in its consumer credit card agreement[s]–i.e., by contract." *Ammons*, *supra*, 2018 WL 3134619, *10 (citing 30 FCC Rcd. at 7993).

The Agency rejected the bank's position.

The TCPA assigns the burden of proving consent to the caller, and if callers could dictate the terms of revocation, the FCC feared they would "shift" that burden "onto consumers." 30 FCC Rcd. at 7998.

"For example, if a caller receives a consumer's valid oral consent for certain messages, but requires the consumer to fax his or her revocation to the caller," "such conditions materially diminish the consumer's ability to revoke consent by imposing additional burdens–especially if

disclosure of such conditions is not clear and conspicuous, and not repeated to the consumer with each message." *Id.* at 7997.

Instead, in agreement with the Third Circuit's *Gager* decision, the Agency reasoned that "any silence in the statute as to the right of revocation should be construed in favor of consumers." 30 FCC Rcd. at 7993 (quoting *Gager*, 727 F.3d at 270). Consumers enjoyed the right to revoke consent at common law. *Gager*, *supra*, 727 F.3d at 270–71 (citing Restatement (Second) of Torts § 892). "Nothing in the language of the TCPA or its legislative history supports the notion that Congress intended to override a consumer's common law right to revoke consent." 30 FCC Rcd. at 7994.

The FCC therefore concluded that "[a] called party may revoke consent at any time and through any reasonable means," including "by way of a consumer-initiated call," or "directly in response to a call initiated or made by a caller." *Id.* at 7989–90, 7996. Callers in Premier's position "may not limit the manner in which revocation may occur." *Id.* at 7990.

Some courts following the 2015 ruling regard the FCC's stance against limits on the right of revocation as clear and "unambiguous." *Patterson*, *supra*, 2018 WL 647438 at *3; *Ammons*, *supra*, 2018 WL 3134619 at *12. To that end, they reject "prohibition[s] on the later revocation of consent" arising from "boilerplate consent provision[s]." *Ginwright*, 280 F. Supp.3d at 683. "Such a prohibition . . . would be inconsistent with the FCC's ruling that a consumer 'has a right to revoke consent' . . . including when originally provided in a credit application." *Id.* (citations omitted).

The FCC, however, arguably cast doubt on this interpretation while defending the 2015 ruling on petition for review before the United States Court of Appeals for the District of Columbia.

There, a group of petitioners "object[ed] to the Declaratory Ruling insofar as it might preclude callers and consumers from contractually agreeing to revocation mechanisms." *ACA Int'l*, *supra*, 885 F.3d at 710. In response, the FCC clarified that its 2015 decision "did not address whether contracting parties can select a particular revocation procedure by mutual agreement." *Id.* "The ruling precludes unilateral imposition of revocation rules by callers; it does not address revocation rules mutually adopted by contracting parties." *Id.*

Accordingly, "[n]othing in the Commission's order should be understood to speak to parties' ability to agree upon revocation procedures." *Id.*

But the FCC's clarification does not help Premier in this case, because here, there is also no "particular revocation procedure" set by "mutual agreement" between the parties.

The credit card agreements include consent to call provisions, but they do not expressly prohibit Hodge from revoking his consent for the automated calls. Premier's position, in essence, is that Hodge irrevocably waived his right of revocation even though the agreements "*did not mention revocation at all.*" *See Ammons*, *supra*, 2018 WL 3134619 at *13, 15 (rejecting the argument that a contract silent regarding revocation demonstrated a waiver of the right of revocation (emphasis in original)). Perhaps "[n]othing in the Commission's [2015 ruling] . . . speak[s] to parties' ability to agree upon revocation procedures," *ACA Int'l*, *supra*, 885 F.3d at 710, but as it stands, Premier and Hodge have made no such agreement.

Defendants claim that whether I construe the credit card agreements under Ohio, or South Dakota law, they have demonstrated Hodge waived his right to revoke prior express consent.[8] Yet I am not persuaded that I can "read into" these agreements "an effective, permanent revocation of

---

[8] The agreements specify that the "terms of [Hodge's] credit account[s]" are "governed by the laws of South Dakota and applicable federal law." (Doc. 43-1, ID 627, 630).

rights under the TCPA." *Skinner v. Bluestem Brands, Inc.*, 2015 WL 4135269, * 3 (S.D. Miss. 2015).

"Under any law applicable here, a waiver should be clear enough for a court to fairly conclude that the person knowingly and voluntarily intended to waive their rights." *Id.* Hodge cannot have "knowingly and voluntarily intended" to waive his right to revocation pursuant to a pair of agreements that mention neither revocation of consent, nor waiver. *Compare Holzer v. Dakota Speedway, Inc.*, 610 N.W.2d 787, 797 (S.D. 2000) (finding a waiver in the case of a "clear and unambiguous statement immediately before the signature line"); *with Oxton v. Rudland*, 897 N.W.2d 356, 362 (S.D. 2017) (no waiver where "neither the circumstances nor the contract language support that the intent was to waive disclosure requirements").

Nor can I "create a new contract" by inserting a waiver provision into a set of agreements where none exists. *Geczi v. Lifetime Fitness*, 973 N.E.2d 801, 805 (Ohio Ct. App. 2012). "Contracting parties are held to the terms of their agreements, and disputes cannot be resolved by adding words the parties left out," *Gettysburg Sch. Dist. 53-1 v. Larson*, 631 N.W.2d 196, 200–01 (S.D. 2001), yet that is just what Premier would have me do here–add a waiver not expressed in the terms of the agreements.

Having failed to bargain for an express waiver, Premier's claim that Hodge's consent is irrevocable is more akin to the "unilateral imposition of revocation rules" the FCC rejected than a "revocation procedure by mutual agreement" it might one day approve. *ACA Int'l*, *supra*, 885 F.3d at 710.

"Moreover, our Court of Appeals has advised that to the extent that any contract provision is ambiguous (e.g., silent as to waiver of the right of revocation) it 'should be construed against its drafter.'" *Ammons*, *supra*, 2018 WL 3134619 at *13 (quoting *Royal Ins. Co. of Am. v. Orient*

*Overseas Container Line Ltd.*, 525 F.3d 409, 423 (6th Cir. 2008)). South Dakota and Ohio law are to the same effect. *Coffey v. Coffey*, 888 N.W.2d 805, 809 (S.D. 2016); *Geczi*, *supra*, 973 N.E.2d at 804–05. Construing the credit card agreements against Premier, the parties here plainly "did not contractually agree to a revocation mechanism," or a waiver. *Ammons*, 2018 WL 3134619 at *15.

Further, insofar as the FCC's 2015 ruling did not squarely invalidate contractual limits on revocation, *Gager*–the case on which the FCC relied–did.

*Gager* holds that a caller's "contractual relationship" with the consumer does not "exempt" it "from the TCPA's requirements," even where the consumer's prior express consent forms "part of the 'consideration'" for the parties' contract. 727 F.3d at 272–73. The Third Circuit gave two reasons for its holding: First, "[a]lthough . . . the level of contact that a debtor will consent to may be relevant" in negotiating a line of credit, "the ability to use an autodialing system to contact a debtor is plainly not an essential term to a credit agreement." *Id.*

Second, and "[m]ore importantly," *Gager* dismissed the claim that being party to a credit card agreement "somehow waives" a consumer's rights under the Act: "The fact that [a plaintiff] entered into a contractual relationship with [the defendant] d[oes] not exempt [the defendant] from the TCPA's requirements." *Id.*

And the Third Circuit is not alone in reaching that conclusion.

Courts within the Eleventh Circuit also "favor[] a *Gager*-like, common-law approach to consent that permits revocation even in the presence of a contract." *Patterson*, *supra*, 2018 WL 647438 at *5; *Target Nat'l Bank v. Welch*, 2016 WL 1157043, *4–5 (M.D. Fla. 2016). Defendants' reliance on a single line in *Osorio*, *supra*, does not prove otherwise.

In *Osorio*, the Eleventh Circuit noted that a debtor may orally revoke consent "in the absence of any contractual restriction to the contrary." 746 F.3d at 1255; *see also Schweitzer v.*

*Comenity Bank*, 866 F.3d 1273, 1275, 1280 (11th Cir. 2017) (permitting partial revocation of consent over the phone and reiterating *Osorio*'s "in the absence of any contractual provision to the contrary"). Seizing on this language, Premier argues that the Eleventh Circuit did not side with *Gager*, but "left open the question of whether an express 'consent-to-call' contract provision binds a consumer under the TCPA, such that it cannot be revoked." (Doc. 28, ID 276).

Defendants are mistaken.

For one, district courts within the Eleventh Circuit "construe 'in the absence of any contractual restriction to the contrary' narrowly," and for good reason. *Patterson*, *supra*, 2018 WL 647438 at *5. The Eleventh Circuit issued *Osorio* in 2014, "one year before the FCC unequivocally stated that a caller may not limit the ways a called party may revoke his consent." *Id.* (citing 30 FCC Rcd. at 7990). Since then, at least two district courts within that circuit have suggested that the Agency's 2015 ruling "has the force of law and abrogates prior FCC Orders and case law on point," including the disputed language in *Osorio*. *Id.* (quoting *Rodriguez v. DFS Servs., LLC*, 2016 WL 369052, *6 (M.D. Fla. 2016)).

For another, even if I were inclined to follow dicta from another circuit that "has never been expounded upon," *id.*, I am not confronted with the question defendants insist *Osorio* "left open"–that is, there is no "contractual provision to the contrary" in this case that prevents Hodge from revoking consent orally, or by any other means. *Osorio*, *supra*, 746 F.3d at 1255.

Even under *Osorio* then, Hodge was entitled to revoke his prior express consent, "its embodiment in the written credit card agreement[s] notwithstanding." *Target*, *supra*, 2016 WL 1157043 at *5.

## 2. Authority Rejecting Revocation Pursuant To Contract

Premier urges me to disregard *Gager* in favor of *Reyes*, a Second Circuit case holding that "the TCPA does not permit a party who agrees to be contacted as part of a bargained-for exchange to unilaterally revoke that consent." 861 F.3d at 56.

*Reyes* distinguished *Gager*, *Osorio* and the FCC's 2015 ruling on the ground that they considered only a "narrow question: whether the TCPA allows a consumer who has freely and unilaterally give his or her informed consent to be contacted can later revoke consent." *Id.* at 56.

According to *Reyes*, such "voluntary consent" differs from consent "included as an express provision" in a "binding legal agreement." *Id.* at 57. Like the Third Circuit, the *Reyes* court agreed that the TCPA incorporates the common-law meaning of "consent," but applied the contractual understanding of the term, instead of the tort-law understanding–an odd choice, given the Act's intended goal of limiting robocalls, which "Congress viewed as a nuisance and an invasion of privacy." *Leyse*, *supra*, 804 F.3d at 322 (citation omitted).

"Reyes's consent to be contacted . . . was included as an express provision of a contract to lease an automobile" from the defendant. *Reyes*, *supra*, 861 F.3d at 57. "It is black-letter law that one party may not alter a bilateral contract by revoking a term without the consent of the counterparty." *Id.* So, the court reasoned, the plaintiff could not unilaterally revoke his consent to automated calls from the defendant.

I find *Reyes* "highly problematic for multiple reasons," many of which *Ammons*, *supra*, sets out in detail. *See* 2018 WL 3134619 at *12–14. But to address only the most significant:

First, it misreads *Gager*. The Third Circuit explicitly held that a consumer's "contractual relationship" with a caller does not establish a "waive[r] of her rights under the TCPA," whether or not her consent to automated calls "is part of the 'consideration' that the applicant offers in

support of her application" for a line of credit. *Gager*, *supra*, 727 F.3d at 273–74. To dismiss *Gager* as involving only "voluntary consent," as *Reyes* does, is to ignore the decision's plain language. 861 F.3d at 57.

*Reyes* similarly ignores the analytical distinction between TCPA consent and contractual consent on which *Gager* turns. The Third Circuit dismissed the defendant's "argument that its contractual relationship with Gager somehow waives her rights under the TCPA" as "incorrect" *see* 727 F.3d at 274, precisely because "TCPA-engendered consent . . . is beyond the scope of [any] contract." *Patterson*, *supra*, 2018 WL 647438 at *5.

Here, for instance, Hodge gave his prior express consent the moment he offered Premier the cell phone numbers. Provision of the numbers constitutes "prior express consent" within the meaning of 47 U.S.C. § 227(b)(1)(A)(iii), even in the absence of a credit card agreement specifying the point. *Baisden*, *supra*, 813 F.3d at 344. TCPA consent is simply "not a matter of contract, nor subject to contract principles." *Ginwright*, *supra*, 280 F. Supp.3d at 683 (citation omitted).

Failing to see that distinction, the *Reyes* court runs into the same trouble Premier does: it does not explain how a contract which does not discuss revocation can be read to waive the right to revoke consent. "[S]pecifically, where the 'consent' provision in the relevant agreement granted consent to be called *but did not mention revocation at all*, the *Reyes* court did not address why it was appropriate to implicitly find at summary judgment that a clear waiver of the right had occurred." *Ammons*, *supra*, 2018 WL 3134619 at *13 (emphasis in original).

Unlike the *Reyes* court, I am not free to "implicitly find at summary judgment" *id.*, a waiver "not expressed in the clear language employed by the parties." *Geczi*, *supra*, 973 N.E.2d at 805; *see also Gettysburg Sch. Dist.*, *supra*, 631 N.W.2d at 200–01.

Second, and just as important, *Reyes* is contrary to the FCC's 2015 ruling.

Again, the FCC cautioned that allowing callers to designate the exclusive means of revocation "materially impair[s]" consumers' rights. 30 FCC Rcd. at 7997. Permitting callers to demand revocation in writing, for example, "arguably would mean that a caller–even one with actual knowledge that a consumer has revoked previously-given consent–would be free to robocall a consumer without facing TCPA liability, despite the consumer's repeated reasonable attempts to revoke consent." *Id.*

Given the FCC's disapproval of limitations on the method of revocation, "it is a bridge too far" to conclude that the Agency would sanction Premier's elimination of the right altogether. *Ammons*, *supra*, 2018 WL 3134619 at *12.

More to the point, even if I consider the FCC's later clarification of the 2015 ruling and assume that the Agency would approve revocation terms "mutually adopted by contracting parties," *ACA Int'l*, *supra*, 885 F.3d at 710, this is not a case of "mutually" agreed upon terms. Defendants seek to "unilateral[lly] impos[e]" a prohibition against revocation they neglected to include in the credit card agreements in the first instance. *Id.*

That being so, the FCC's default rule against limitations on revocation should control: "Where the consumer gives prior express consent, the consumer may also revoke that consent." 30 FCC Rcd. at 7996. Premier "may not abridge a consumer's right to revoke consent using any reasonable method." *Id.*

Third, and finally, *Reyes* is inconsistent with the purpose of the Act.

Hodge's position is not unique. The consumer complaining about unwanted calls in a TCPA action "often has a contractual relationship with the company placing those calls." *Ammons*, *supra*, 2018 WL 3134619 at *11 (collecting cases); *see also*, *Baisden*, *supra*, 813 F.3d at 344 (debtors "typically" offer their cell phone number "as part of a credit application" (citation

omitted)). That contract may require him to consent to certain automated or prerecorded phone calls.

Allowing the consumer to revoke his consent verbally is "consistent with the government interest articulated in the legislative history of the TCPA," namely, "enabling the recipient of incessant and unwanted calls to 'tell the autodialers to simply stop calling.'" *Schweitzer*, *supra*, 866 F.3d at 1276 (citation and brackets omitted).

On the other hand, if creditors could contract around the TCPA, "one imagines that every company in the nation–from Dell Financial and State Farm Bank, to every student loan provider, to every catalogue sales company–would amend their contracts to require customers to waive every right their customers currently have." *Ammons*, *supra*, 2018 WL 3134619 at *13 (quoting *Skinner*, *supra*, 2015 WL 4135269 at * 3). In short, "adopt[ing] the prohibition on revocation in *Reyes* . . . would result in the effective circumvention of the TCPA in the debtor-creditor context." *Ginwright*, *supra*, 280 F. Supp.3d at 683.

I decline defendants' invitation to go that route.

Rather, for the foregoing reasons, I agree that Hodge's "contractual relationship" with Premier did not "exempt" defendants "from the TCPA's requirements," even if his consent "is part of the consideration" for the parties' credit card agreements. *Gager*, *supra*, 727 F.3d at 273–74.

### D. Timing Of Revocation

Because I agree that Hodge could revoke his prior express consent, the final wrinkle in this case is determining when revocation occurred.

Defendants admit that on July 12, 2016, Hodge asked a Premier customer representative to stop contacting plaintiffs. They also admit that Premier continued calling for another month, and did not stop until Hodge's second request on August 17, 2016. Still, an issue of fact remains

regarding damages, as plaintiffs argue they revoked consent twice before July 12, 2016–and the second of those instances is founded on evidence "such that a reasonable jury could return a verdict" in their favor. *Anderson*, *supra*, 477 U.S. at 248.

Plaintiffs first claim that on or around May 19, 2016, Rodriguez asked Hodge to call Premier to tell them to call only his phone, rather than hers. Hodge testified that he made the call, but could not remember when it occurred, or "what [he] told them." (Doc. 43-2, ID 672).[9] His vague recollection is no more than a mere "scintilla" of evidence suggesting that he contacted defendants prior to July 12, 2016, and does not create a genuine issue of fact. *Id.* at 252.

Rodriguez, by contrast, recalls her attempt to revoke consent before July 12 in more vivid detail. She claims that she asked a Premier representative to stop contacting her during a call on July 7, 2016, an incident she "remember[ed] . . . pretty well," because she was in the hospital giving birth at the time she received the call. (Doc. 43-3, ID 806).

Her testimony regarding the conversation was also specific:

> I was having my daughter. My phone wouldn't stop ringing. They kept calling and calling and calling, and I finally answered to tell them to please stop calling my phone again. I was in the hospital, I had just had a baby and this was very inconvenient, and I was frustrated. . .   I don't think I was the most pleasant. I believe I was rude, to a certain extent. But that one, I only really remember because I was so, so upset that they just would not stop. And it was a day that should have been memorable for me. Not that sort of memory.

(Doc. 43-3, ID 805–06).

If Rodriguez indeed asked Premier to stop contacting her phone before July 12, 2016, defendants should have stopped calling her phone number. As explained, she was a "called party"

---

[9] This, I assume, is the "at least one additional time prior" to July 12, 2016 when Hodge asked Premier to stop calling, to which plaintiffs refer in their brief. (Doc. 36, ID 399). Plaintiffs point to no further evidence regarding when this "one additional time prior" was, or what Hodge said during that conversation.

relative to the 70 number, authorized to give or revoke consent under the statute. 47 U.S.C. § 227(b)(1)(A).

By pointing to a particular conversation, furthermore, Rodriguez has gone "beyond the pleadings" and designated a specific facts demonstrating an issue for trial. *Celotex*, *supra*, 477 U.S. at 324. Even so, Premier insists plaintiffs did not revoke consent until July 12, 2016.

"This is precisely the type of factual dispute beyond the purview of summary judgment." *Patterson*, *supra*, 2018 WL 647438 at *6 (footnote omitted); *Ammons*, *supra*, 2018 WL 3134619 at *15–16; *see also Schweitzer*, *supra*, 866 F.3d at 1278 (determining whether revocation occurred is a fact-intensive inquiry).

Because Hodge gave prior express consent to receive Premier's automated calls, and because such consent precludes Rodriguez's TCPA claim up to the time of revocation, Premier is entitled to summary judgment on plaintiffs' TCPA claims arising from calls defendants made to plaintiffs before July 7, 2016.

I will, however, deny Premier summary judgment on plaintiffs' TCPA claims arising from calls defendants made after July 7, 2016.

**Conclusion**

For the foregoing reasons, it is hereby

ORDERED THAT:

1. Defendants' motion for summary judgment (Doc. 28) be, and the same hereby is, granted in part and denied in part; and

2. The clerk shell set a status teleconference forthwith to set a schedule for trial.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge